## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| McDONALD'S CORPORATION, a Delaware Corporation, and DIC ENTERTAINMENT CORPORATION, a Delaware Corporation, | ) ) ) |
| Plaintiffs, | |
| v. | |
| CHINA RETAIL MANAGEMENT LIMITED, organized under the laws of British Virgin Islands, CORNERSTONE OVERSEAS INVESTMENT LIMITED, organized under the laws of British Virgin Islands, | ) ) ) ) ) ) |
| Defendants. | ) ) |

JH

07CV4443
JUDGE COAR
MAG.JUDGE NOLAN

FILED

AUG - 7 2007 rq
AUG 7 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### COMPLAINT

Plaintiffs McDonald's Corporation ("McDonald's") and DIC Entertainment Corporation ("DIC") (together, "Plaintiffs") assert the following Complaint against China Retail Management Limited ("CRM") and Cornerstone Overseas Investment Limited ("Cornerstone") (together, "Defendants") and in support of the Complaint state as follows:

### INTRODUCTION

1.     This action arises out of CRM's breach of its obligation under its License Agreement (the "Agreement") with Plaintiffs and Cornerstone's breach of its obligation under the Form of Guaranty (the "Guaranty") with Plaintiffs. Plaintiffs licensed CRM to market the "McKids" Brand and other McDonald's brands through the sale of licensed products such as clothing, toys, and novelty items in a number of Asian markets, including Korea, Singapore, Hong Kong, and The People's Republic of China, among others. In exchange for that license,

CRM agreed to market the McDonald's brands and to make minimum guaranteed payments totaling over $20 million to Plaintiffs. CRM has breached its obligations under the Agreement by failing to meet its marketing obligations and failing to make the required guaranteed payments. Cornerstone agreed in the Guaranty to guarantee the performance of all of CRM's obligations under the Agreement. Cornerstone has breached its obligations as guarantor by failing to satisfy CRM's obligations to Plaintiffs.

## THE PARTIES

2.      Plaintiff McDonald's is incorporated under the laws of Delaware with its principal place of business in Oak Brook, Illinois. McDonald's is a quick-service restaurant company. McDonald's restaurants are located around the world. Due to operations excellence and leadership marketing, McDonald's has a leading market share in every area of the world.

3.      Plaintiff DIC is incorporated under the laws of Delaware with its principal place of business in Burbank, California. DIC is a fully integrated global brand management company, dedicated to creating, developing, producing, distributing, marketing, and merchandising family-based intellectual properties.

4.      Defendant CRM is organized under the laws of the British Virgin Islands with its principal place of business in Hong Kong. CRM is a subsidiary of Cornerstone and one of a group of companies known as the "Cornerstone Group" controlled by an individual named Jeff Hsieh. CRM has been distributing toys in China under the Playwell banner since the early 1990s. CRM operates over 500 retail outlets and 11 distribution centers throughout China. CRM manages Disney Corners and distributes Disney-licensed products, as well as other well-known toy-branded products such as Wild Planet, Sassy, Radical Games, and Warner Brothers licensed properties (*e.g.*, Batman Begins, Harry Potter, Superman, etc.). CRM also exclusively operates Coca-Cola Stores in China.

2

5.    Defendant Cornerstone is organized under the laws of the British Virgin Islands with its principal place of business in Hong Kong. Jeff Hsieh founded Cornerstone in 2001 and is Cornerstone's sole shareholder and Chief Executive Officer. Cornerstone has a complex network of related party-trading relationships with other companies owned by Hsieh, including, among others, CRM, Wham-O, Playwell, and Worldwide Toys Limited.

## JURISDICTION AND VENUE

6.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is diverse and because the matter in controversy exceeds $75,000.

7.    Venue is proper in the Northern District of Illinois because both the Agreement and the Guaranty contain choice of law and venue provisions that select the United States District Court for the Northern District of Illinois as the proper venue in which to adjudicate any disputes arising under the agreements.

8.    This Court may exercise personal jurisdiction over CRM because CRM agreed in the Agreement to be subject to this Court's personal jurisdiction and accept service of process by certified mail. Likewise, this Court may exercise personal jurisdiction over Cornerstone because Cornerstone agreed in the Guaranty to be subject to this Court's personal jurisdiction and accept service of process by certified mail.

## FACTUAL BACKGROUND

9.    On July 1, 2005, Plaintiffs entered into a Licensing Agreement with CRM that was guaranteed by Cornerstone.

10.    The Agreement (attached as Exhibit A) provided that Plaintiffs:

> [G]rant[] to LICENSEE, and LICENSEE hereby accepts, the non-transferable, non-assignable, non-sublicensable (except to LICENSOR pre-approved sub-licensees) and exclusive (except as otherwise set forth herein) right and license to use the Property during the Licensed Term of this Agreement, solely within the

3

> Licensed Territory and solely in connection with the
> manufacturing, advertising and promotion of the Licensed
> Products, and the sales and distribution of the Licensed Products to
> Authorized Channels of Distribution, and for no other products or
> services.

(Agreement § A1.)

11.     The Agreement further provided that:

> The Property consists only of the trademarks, copyrights,
> characters, logos, images, designs, titles, artwork, and/or other
> creative elements for the McDonald's Property as designated in
> writing by LICENSOR or AGENT.

*     *     *

> The Licensed Trademarks shall include:

> 1.     The McKids Brand and other McDonald's consented brand
>        names (including the McDonald's name itself) which are
>        deemed appropriate by LICENSOR and which are pre-
>        approved in writing by LICENSOR or AGENT.

(*Id.* § A2.)

12.     The Agreement further provided that the licensed products would include the

following: apparel, apparel accessories, automobile accessories, consumer electronics, footwear,

gifts, housewares, novelty items, personal care [items], stationery, toys, and telecommunications

products and accessories.  (*Id.* § A3.)

13.     The Agreement specified that the licensed territory would include the following

countries: The People's Republic of China, Hong Kong, Macau, Taiwan, Korea, Singapore,

Malaysia, The Philippines, Thailand, Indonesia, Laos, and Vietnam.  In addition, the Agreement

granted CRM a right of first negotiation for a license to market McDonald's-branded products in

India, Pakistan, and Sri Lanka.  The licensed territory included the protectorates, possessions,

territories, military bases, and embassies of the licensed countries.  (*Id.* § A4.)

4

14.    The Agreement specified that the retail launch of the licensed products should take place no later than April 30, 2006. (*Id.* § A13.)

15.    The Agreement further specified that CRM was required annually to generate net sales of licensed products sufficient to meet a Guaranteed Minimum Royalty. Further, in support of that sales effort, and in support of the McDonald's brands, CRM was required to spend at least 2% of its net sales to market McDonald's-branded products, and CRM was required to make a substantial initial marketing effort to support the launch of the McDonald's-branded products. (*Id.* §§ A9, A12.)

16.    McDonald's, DIC, and CRM contemplated that CRM would sell a substantial amount of McDonald's-branded product and that CRM would pay royalties on those sales. For net sales of McDonald's-branded product up to $50 million, CRM was required to pay an 8% royalty. For net sales between $50 million and $100 million, CRM was required to pay a 9% royalty. For net sales over $100 million, CRM was required to pay a 10% royalty rate. Royalty payments were to be calculated according to cumulative sales throughout the term of the Agreement and would not be reset annually or upon renewal of the license. (*Id.* § A10.)

17.    In addition, the Agreement required CRM to pay Plaintiffs no less than an agreed Guaranteed Minimum Royalty payment in each contract year regardless of the actual amount of sales of branded products. Those payments were:

| | |
|---|---|
| Year One | $1,750,000 |
| Year Two | $2,000,000 |
| Year Three | $3,750,000 |
| Year Four | $6,000,000 |
| Year Five | $7,500,000 |

The Year One Guaranteed Minimum Royalty was due no later than twelve months from the retail launch, or on April 30, 2007. (*Id.* §§ A11, A13.) The successive Guaranteed Minimum

5

Royalty payments were due in twelve-month intervals thereafter. (*Id.*) Cornerstone guaranteed the Guaranteed Minimum Royalty payments, as documented in the Guaranty (attached as Exhibit B).

18.     The Agreement further specified that, if CRM failed to make a payment on time, interest would accrue at the greater of 18% annually or a rate 2% above the prime rate being charged by Chase Manhattan Bank in New York, until the deficient payment was paid in full. (Agreement § 3.4(b).)

19.     On April 30, 2007, CRM failed to make the Guaranteed Minimum Royalty payment due for the first year of the license.

20.     On May 3, 2007, DIC informed Jeff Hsieh (CRM's and Cornerstone's Chief Executive Officer and owner) that the Guaranteed Minimum Royalty payment was three days late and DIC demanded immediate payment.

21.     In various conversations and correspondence with DIC during the Spring and Summer of 2007, Hsieh stated that neither CRM nor Cornerstone would make the Guaranteed Minimum Royalty payment due on April 30, 2007, nor would CRM or Cornerstone make the Guaranteed Minimum Royalty payments due in any future year under the Agreement. In addition, Hsieh stated that CRM had not entered into any relationships with sub-licensees or manufacturers needed for CRM to market McDonald's-branded products. On information and belief, CRM sold no McDonald's-branded product during the first year of the license. And, on information and belief, CRM spent nothing to market the launch of McDonald's-branded retail product, or to market the McDonald's brands in the Asian territory licensed to CRM.

22.     On or about June 14, 2007, pursuant to the requirements set out in section 9.2(a) of the Agreement, DIC sent Hsieh—as Chief Executive Officer of CRM and Cornerstone—a

notice of default for CRM's failure to pay the Guaranteed Minimum Royalty. DIC indicated that CRM could cure the default by making the past due royalty payment.

23.    Following further discussions, on or about August 2, 2007, Jeff Hsieh's attorneys informed DIC that CRM and Cornerstone were potentially insolvent, so Hsieh would be winding up the business of both companies.

24.    Thus, it is apparent that neither CRM nor Cornerstone will make the Guaranteed Minimum Royalty payment that had been due April 30, 2007. CRM will not perform its continuing obligations under the Agreement. And Cornerstone will not make any future Guaranteed Minimum Royalty payments for CRM.

## COUNT I
## **BREACH OF CONTRACT BY CRM**

25.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-24 above.

26.    The Agreement is a valid, binding and enforceable contract.

27.    Under the terms of the Agreement, CRM agreed that it would pay Plaintiffs $1.75 million on April 30, 2007.

28.    In addition, under the terms of the Agreement, CRM agreed it would pay interest on late payments at the greater of 18% annually or a rate 2% above the prime rate being charged by Chase Manhattan Bank in New York, until the deficient payment was paid in full.

29.    Further, under the terms of the agreement, CRM was required to make a substantial initial marketing effort to support the launch of the McDonald's-branded products.

30.    CRM has breached the Agreement by failing to market McDonald's-branded products, and by failing to make the Year One Guaranteed Minimum Royalty payment.

31.    Plaintiffs have fully performed their obligations under the Agreement.

7

32.    Plaintiffs have been damaged by CRM's breach of the Agreement, including CRM's failure to pay the $1.75 million Year One Guaranteed Minimum Royalty payment due on April 30, 2007 or any interest on that amount, in addition to other damages.

## COUNT II

### BREACH OF CONTRACT BY CRM'S
### ANTICIPATORY REPUDIATION OF THE AGREEMENT

33.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-32 above.

34.    After CRM defaulted on its various obligations under the Agreement, McDonald's and DIC encouraged CRM to take steps to cure its defaults and resume performance of its obligations under the Agreement.

35.    CRM indicated on numerous occasions that it would not be willing or able to perform its obligations under the Agreement going forward.

36.    On or about August 2, 2007, through his attorney, Jeff Hsieh informed DIC that CRM would be winding up its business, making CRM's future performance of its obligations impossible.

37.    McDonald's and DIC have fully performed their obligations under the Agreement, including any obligation to offer CRM an opportunity to cure and including any obligation to confer with CRM in good faith regarding CRM's performance under the Agreement.

38.    CRM has repudiated its obligations under the Agreement going forward.

39.    McDonald's and DIC are damaged by CRM's repudiation because McDonald's and DIC will lose the benefit of CRM's future marketing expenditures, and because McDonald's

8

and DIC will not receive the Guaranteed Minimum Royalties totaling $19.25 million due in Years Two through Five of the Agreement, in addition to other damages.

## COUNT III
## BREACH OF CONTRACT BY CORNERSTONE

40.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-39 above.

41.    The Guaranty is a valid, binding, and enforceable contract.

42.    Under the terms of the Guaranty, Cornerstone agreed that it would provide full, complete, and prompt performance of all of CRM's obligations under the Agreement.

43.    CRM has defaulted on its obligations under the Agreement.

44.    Plaintiffs have demanded that Cornerstone perform its obligations as guarantor of CRM's performance.

45.    CRM has failed to perform fully, completely, or promptly any of its obligations under the Agreement.

46.    Plaintiffs have fully performed their obligations under the Agreement.

47.    Plaintiffs have been damaged by Cornerstone's breach of the Guaranty, including CRM's failure to pay the $1.75 Year One Guaranteed Minimum Royalty payment due on April 30, 2007, or any interest on that amount, in addition to other damages.

## COUNT IV
## BREACH OF CONTRACT BY CORNERSTONE'S
## ANTICIPATORY REPUDIATION OF THE GUARANTY

48.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-47 above.

9

49.     After CRM defaulted on its various obligations under the Agreement, McDonald's and DIC encouraged CRM to take steps to cure its defaults and resume performance of its obligations under the Agreement. In addition, McDonald's and DIC encouraged Cornerstone to perform CRM's obligations.

50.     CRM indicated on numerous occasions that it would not be willing or able to perform its obligations under the Agreement going forward. Cornerstone indicated on numerous occasions that it would not step in to provide performance in lieu of CRM.

51.     On or about August 2, 2007, through his attorney, Jeff Hsieh informed DIC that Cornerstone would be winding up its business, making Cornerstone's future performance of its obligations as guarantor impossible.

52.     Plaintiffs have fully performed their obligations under the Agreement, including any obligation to offer Cornerstone an opportunity to cure a breach by CRM of the Agreement.

53.     Cornerstone has repudiated its obligations under the Guaranty going forward.

54.     Plaintiffs are damaged by Cornerstone's repudiation, because Plaintiffs will lose the benefit of Cornerstone's guarantee of CRM's obligation to make future marketing expenditures, and because Plaintiffs will not receive the Guaranteed Minimum Royalties totaling $19.25 million due in Years Two through Five of the Agreement, in addition to other damages.

**WHEREFORE,** Plaintiffs McDonald's Corporation and DIC Entertainment Corporation pray that this Court enter judgment in their favor and award actual, consequential, incidental, and other damages in excess of $20 million to compensate McDonald's and DIC for their injuries. Plaintiffs also request that they be awarded costs, expenses, and attorneys' fees consistent with

10

the terms of the Agreement and the Guaranty.  In addition, Plaintiffs pray this Court award whatever other relief it deems proper including injunctive or other equitable relief.

Respectfully submitted,

Jonathan C. Bunge (ARDC #6202603)
David E. Grassmick (ARDC #6277563)
Ashley J. Burden (ARDC #6285840)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
Telephone:(312) 861-2000
Facsimile: (312) 861-2200

*Attorneys for Plaintiffs McDonald's Corporation and DIC Entertainment Corporation*

Dated:  August 7, 2007

# COMPLAINT
# EXHIBIT A

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement") is made and entered into as of this ⌐ 1 ┐ day of ___JUL___ 2005 (the "Effective Date"), by and between MCDONALD'S CORPORATION, a Delaware corporation, having an office located at One McDonald's Plaza, Oak Brook, Illinois 60523 (the "LICENSOR"), DIC ENTERTAINMENT CORPORATION, a Delaware corporation, having its principal place of business at 4100 West Alameda Avenue, Burbank, CA 91505 (the "AGENT") and CHINA RETAIL MANAGEMENT LIMITED, a related company of CORNERSTONE OVERSEAS INVESTMENT LIMITED, a corporation organized under the laws of British Virgin Islands, with a principal office located at Chinachem Golden Plaza, 77 Mody Road, Floor UG2, Room UG202, Tsimshatsui East, Kowloon, Hong Kong (the "LICENSEE").

(A) WHEREAS, LICENSOR and its affiliates are the owner of rights, including, without limitation, the trademarks and copyrights, in and to the Property (as hereinafter defined) and LICENSOR has the right to grant licenses to third parties in connection with the manufacture, distribution, sale, advertising and promotion of products in connection with the Property; and

(B) WHEREAS, LICENSEE recognizes that the Property has acquired notoriety and goodwill with the general public and desires to obtain a right to use the Property in connection with the manufacture, distribution, sale, advertising and promotion of the Licensed Products (as hereinafter defined); and

(C) WHEREAS, LICENSOR is willing to grant to LICENSEE a license under the terms and conditions specifically set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants, undertakings, and premises contained herein, and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, the parties agree as follows:

### Deal Terms:

**A1.    Grant**: Subject to all of the terms and conditions set forth in this Agreement, LICENSOR hereby grants to LICENSEE, and LICENSEE hereby accepts, the non-transferable, non-assignable, non-sublicensable (except to LICENSOR pre-approved sub-licensees) and exclusive (except as otherwise set forth herein) right and license to use the Property during the Licensed Term of this Agreement, solely within the Licensed Territory and solely in connection with the manufacturing, advertising and promotion of the Licensed Products, and the sales and distribution of the Licensed Products to Authorized Channels of Distribution, and for no other products or services. No license is granted hereunder for the use of the Property for any other purpose, it being understood that, except for those rights expressly granted to LICENSEE hereunder, all rights, express or implied, are reserved to and belong exclusively to LICENSOR. Notwithstanding the foregoing, LICENSEE's exclusive rights under this Agreement shall not apply to (a) merchandise or products of third parties intended for sale, promotion or distribution through or services of third parties intended for sale, promotion or distribution through or to LICENSOR's restaurants, franchisees, employees or affiliates, even if such merchandise or products fall within the Product Categories, including, by way of example but not limitation, Happy Meal products and related items, and promotional merchandise; or (b) merchandise or products of third parties produced in connection with various events sponsored and/or owned by LICENSOR (such events include, but are not

- 1 -

McDonald's-CRM

limited to, the Olympics, World Cup Soccer, racing teams and the McDonald's All American High School Basketball Game) (collectively, the "Sponsorships"). As part of such Sponsorships, LICENSOR may license certain limited rights to third parties to produce and distribute merchandise directly related to the Sponsorship and LICENSOR shall make reasonable efforts to advise LICENSEE of all such Sponsorships during the Term. Additionally, from time to time, local or regional LICENSOR branded restaurants within the Licensed Territory may participate in limited local and/or regional, retail-directed merchandise programs. LICENSOR is currently unaware of any such local and/or regional programs within the Licensed Territory, and LICENSOR shall attempt to advise LICENSEE of any such local and/or regional programs which may arise during the Term.

In addition, the rights granted herein are non-exclusive as follows: (1) Shanghai Longtrust (SOHO) shall become a sublicense of LICENSEE, subject to SOHO's compliance with LICENSOR's terms and conditions and subject to LICENSEE's ability to reach agreement with SOHO on the terms of a sublicense agreement and SOHO's compliance therewith; (2) nonexclusive as to bicycles, tricycles, bicycle accessories, pedal ride-ons, battery ride-ons, sit-down ride-ons, skateboards, scooters, inline skates and roller skates; non-exclusive (with CDI) as to cash registers, drive thru centers, happy meal dolls, play restaurants, dress up sets, mealtime sets, drive thru sets, milkshake machine or soda machine.

## A2.    The Property:

The Property consists only of the trademarks, copyrights, characters, logos, images, designs, titles, artwork, and/or other creative elements for the McDonald's Property as designated in writing by LICENSOR or AGENT. As used herein, the Property shall only include the forms of the trademarks, copyrights, etc. set forth below, together with any variations thereof which may hereafter be approved in writing by LICENSOR, in its sole and absolute discretion, for use by LICENSEE in connection with the Licensed Products.

The Licensed Trademarks shall include :

1.  The McKids Brand and other McDonald's consented brand names (including the McDonald's name itself) which are deemed appropriate by LICENSOR and which are pre-approved in writing by LICENSOR or AGENT.

## A3.    Licensed Products:

Subject to the conditions set forth hereinafter, LICENSOR grants to LICENSEE the exclusive retail merchandising rights, manufacturing rights, and sub-licensing rights (as described more fully hereinafter) to the following product categories (the "Product Categories"):

1. Apparel
2. Apparel Accessories
3. Automobile Accessories
4. Consumer Electronics
5. Footwear
6. Gifts
7. Housewares
8. Novelty Items
9. Personal Care
10. Stationery

11. Toys
12. Telecommunications Products and Accessories

Products which fall outside of the Product Categories described herein shall be considered by LICENSOR on a case by case basis, and approval of additional Licensed Products and Product Categories shall be at the sole discretion of LICENSOR. Specifically excluded from this Agreement are entertainment-based products, including but not limited to, television broadcast, home video, music, publishing, feature film, mobile applications, interactive gaming, new media, internet-based programming or websites. In addition, the rights granted herein do not extend to toy role play sets, including but not limited to play food or play food sets ("Play Food"). During the Term, LICENSEE shall be obligated to launch, develop and maintain the sale and distribution of approved licensed products in all key categories including toys, apparel, accessories, room décor and publishing/ paper goods and LICENSEE commits to develop lines in accordance with LICENSOR's corporate directive and core initiatives (such as Active Lifestyles).

**A4.    Licensed Territory:**

1. The People's Republic of China
2. Hong Kong
3. Macau
4. Taiwan
5. Korea
6. Singapore
7. Malaysia
8. The Philippines
9. Thailand
10. Indonesia
11. Laos
12. Vietnam

LICENSOR shall grant to LICENSEE the right of first negotiation for the territories of India, Pakistan, and/or Sri Lanka, should LICENSOR elect to designate a master licensee in these territories.

In addition to the countries or regions set forth above, the Licensed Territory shall include the protectorates, possessions, territories, military bases and embassies of such countries.

McDonald's-CRM

**A6.    Authorized Channels of Distribution:**

| Amusement | | Dollar Stores | | Off Price/Discounters | |
|---|---|---|---|---|---|
| Catalogs, with the prior written approval of LICENSOR on a case by case basis | X | Drug Stores | | Specialty Chain Stores | X |
| Category Chains (i.e. Home, Party, Craft, Office, Electronics, Book, Sporting goods) | X | Duty Free Shops | X | Supermarkets and Grocery Stores | X |
| Close Out Stores, which shall be a point of distribution only for the controlled disposal of excess goods as authorized by written approval by LICENSOR on a case by case basis | X | Fundraising | | TV Shopping Channels, with the prior written approval of LICENSOR on a case by case basis | X |
| Convenience Stores | | Independent Stores | X | Vending Machines with the prior written approval of LICENSOR on a case by case basis | X |
| Crane Machines, with the prior written approval of LICENSOR on a case by case basis | X | Mass Merchants and Hypermarkets | X | Warehouse Stores | |
| Department Stores | X | Mid-tier Department Stores | X | Web Retailers, with the prior written approval on a case by case basis | X |
| Direct Mail | X | Music/Video | X | Other:  Stand-alone Stores, with the prior written approval of LICENSOR on a case by case basis, subject to the submission of a business plan for each location | X |

The Authorized Channels of Distribution shall consist only of those channels expressly set forth above and identified with an "X". Intentional distribution by LICENSEE or any of its Sub-LICENSEES to any retailers other than to those within the Authorized Channels of Distribution, or gross negligence on the part of LICENSEE with respect to ensuring that distribution occurs only within the Authorized Channels of Distribution, shall be deemed a breach of this Agreement. LICENSEE shall remain responsible for Licensed Articles of both LICENSEE and of its Sub-LICENSEEs which are sold outside the authorized Channels of Distribution or Licensed Territories and, therefore, must develop controls, procedures, and conditions with each Sub-LICENSEE to assure that the Licensed Articles are sold only in the Authorized Channels of Distribution and only within the Licensed Territories.

**A7.    Licensed Term:**

Effective as of August 18, 2005, and expiring five (5) years from the date of the first Retail Launch (as defined hereinafter), unless sooner terminated in accordance with this Agreement.

Renewal Term Option: Unless sooner terminated, upon the fifth anniversary of the Retail Launch, the Agreement shall be automatically renewed for an additional two years, without additional GMR, should LICENSEE's total Net Sales from months 48 through 60 following the Retail Launch exceed $200,000,000.00 (USD).

**A8.    Sell-Off Period** (if any) – Non-exclusive: One hundred eighty (180) days from the expiration of the Licensed Term.

**A9.    Minimum Net Sales:** During each Contract Year during the Term, LICENSEE's actual Net Sales shall be sufficient to meet the Guaranteed Minimum Royalty applicable for such year.
**Contract Year One** shall be
**Contract Year Two** shall be
**Contract Year Three** shall be

- 4 -

McDonald's-CRM

**Contract Year Four** shall be
**Contract Year Five** shall be

## A10. Earned Royalty:

For Net Sales up to and including $50,000,000.00 (USD), LICENSEE shall pay to AGENT a royalty computed at the rate of eight percent (8%) of all of LICENSEE's Net Sales throughout the Licensed Term.

For Net Sales from $50,000,000.01 (USD) up to and including $100,000,000.00 (USD), LICENSEE shall pay to AGENT a royalty computed at the rate of nine percent (9%) of all of LICENSEE's Net Sales throughout the Licensed Term.

For Net Sales over and above $100,000,000.00 (USD), LICENSEE shall pay to AGENT a royalty computed at the rate of ten percent (10%) of all of LICENSEE's Net Sales throughout the Licensed Term.

For the purposes of determining the royalty rate, Net Sales shall be calculated on a cumulative basis throughout the Licensed Term and shall not be reset annually or upon renewal.

For LICENSOR-approved SUB-LICENSEES, LICENSEE shall be entitled to retain twenty-five percent (25%) of the royalty paid by any SUB-LICENSEE and shall remit the balance to AGENT as Royalties in accordance with the payment provisions described Article III below. Such payments shall be attributed toward LICENSEE's GMR.

## A11. Advances/Guaranteed Minimum Royalties:

LICENSEE shall pay to AGENT no less than the Guaranteed Minimum Royalty (GMR) set forth below, and such GMR payments shall be applied against the Earned Royalties payable to AGENT in such Contract Year. Cross-collateralization of Royalty payments to meet the GMR shall be allowed only for sequential years within the Term [e.g., if the total of Net Sales within one contract year results in Royalty payments which exceed the GMR as set forth below, the excess royalty for this contract year may be used to recoup the GMR in the subsequent contract year. The converse shall also be true; should Net Sales for one contract year fall short and consequently LICENSEE will not be able to meet the GMR for this contract year, LICENSEE may use excess royalties paid over and above the GMR from the previous contract year only to recoup the shortfall from the deficient contract year] . Additionally, the GMR payments shall be guaranteed by CORNERSTONE OVERSEAS INVESTMENT LIMITED, which shall execute the form of Guarantee attached hereto as Exhibit F.

At least thirty percent (30%) of royalty payments for each contract year and within each Licensed Territory shall be derived from the sale of apparel. In the event that LICENSEE fails to achieve this threshold within a particular country within the Licensed Territory (an "Impaired Territory"), in any Contract Year, the LICENSOR shall have the right, but not the obligation, to terminate LICENSEE's rights to apparel and apparel-related accessories within any Impaired Territory, and grant such rights to another party. Should LICENSOR terminate LICENSEE's rights to apparel and apparel-related accessories within the People's Republic of China in accordance with the terms of this paragraph, such termination shall result in a thirty percent (30%) reduction in the GMR to be paid on sales following the date of such termination.

McDonald's-CRM

| Contract Year | Amount of GMR (USD) |
|---|---|
| Advance Payment | $2,000,000.00 (USD), due upon LICENSEE's signature of this Agreement |
| Contract Year One | $1,750,000.00 (USD), due on or before 12 months from Retail Launch |
| Contract Year Two | $2,000,000.00 (USD), due on or before 24 months from Retail Launch |
| Contract Year Three | $3,750,000.00 (USD), due on or before 36 months from Retail Launch |
| Contract Year Four | $6,000,000.00 (USD), due on or before 48 months from Retail Launch |
| Contract Year Five | $7,500,000.00 (USD), due on or before 60 months from Retail Launch |

In the event LICENSEE's royalty payments based on actual sales during any Contract Year do not reach the GMR for such Contract Year, LICENSEE shall be obligated to pay the difference between the actual royalties paid during such Contract Year and the GMR for such Contract Year (subject to the cross-collateralization provision set forth above). Notwithstanding the foregoing, in the event LICENSEE's royalty payments based on actual sales during any Contract Year are less than the GMR for such Contract Year by more than ten percent (10%) after taking any permissible cross-collateralization into account, LICENSOR shall have the right, but not the obligation, to terminate this Agreement for breach; provided, however, LICENSOR shall meet with LICENSEE in good faith prior to exercising such right to terminate to discuss the reasons for LICENSEE's failure to achieve the minimum royalties on actual sales. After concluding the good faith discussions, LICENSOR shall have the right, in its sole discretion, to terminate the agreement or to continue the Agreement (or make any amendments or modifications mutually acceptable to the parties).

## A12. Marketing Fund

In addition to the Earned Royalties paid or to be paid to AGENT, for each Contract Year, LICENSEE shall be required to set aside as a Marketing Fund an amount equivalent to two percent (2%) of LICENSEE's (including Sub-LICENSEEs) Minimum Net Sales for each Contract Year. LICENSEE shall use the Marketing Fund to develop and finance consumer marketing initiatives directly in support of the Property, including but not limited to print advertisements, television advertisements, outdoor advertisements, signage, display units, catalogs, special events, and sweepstakes. LICENSEE shall be required to submit for LICENSOR's approval a business plan for each marketing initiative which LICENSEE intends to be subsidized by the Marketing Fund, and any withdrawals from the Marketing Fund shall require the prior written approval of LICENSOR. In addition, LICENSEE shall be required to submit, along with its Royalty reports and statements as described more fully in Paragraph 3.5, accounting and documentation of each expenditure from the Marketing Fund. If such accounting demonstrates that LICENSEE has spent within a Contract Year less than two percent (2%) of Net Sales on LICENSOR-approved marketing initiatives, then the balance shall be remitted to LICENSOR with the next quarter's payments. Notwithstanding the foregoing, in the event LICENSOR creates a joint retail/restaurant marketing initiative ("Joint Initiative") throughout the Territory or Worldwide, LICENSOR shall be able to access the Marketing Fund as well as the marketing funds from other licensees to help finance the Joint Initiative.

LICENSEE acknowledges that an upfront marketing commitment, over and above the Marketing Fund set forth in this section, shall be required on the part of LICENSEE, and such commitment shall be determined in good faith between the parties as it relates to the transition and launch strategy for the Property.

McDonald's-CRM

**A13.    Marketing Dates:**

**Commencement Date**:    To be negotiated
(Date before which LICENSEE shall not make any Licensed Products available for distribution for delivery to customers.)

**Distribution Deadline**:    To be negotiated
(Date by which LICENSEE shall have made a commercially reasonable quantity of Licensed Products available for distribution for delivery to customers.)

**Retail Launch:**    The Retail Launch shall be defined as the date of the launch of the first retail store or outlet operation by LICENSEE, unless LICENSEE elects to sell through the existing stores and/or outlets within the Licensed Territory or sell through consignment or other department store sales; however, in any event, the Retail Launch shall be no later than April 30, 2006. Notwithstanding the foregoing, apparel sales by SOHO prior to April 30, 2006 shall not be deemed to constitute a Retail Launch (solely for purposes of calculating the Term under A7, and without waiving any of LICENSOR's rights or LICENSEE's obligations hereunder) absent LICENSEE'S sale of Licensed Products in accordance with this Agreement.

**A14.    Copyright Notice**: The Copyright Notice shall be:

© [Year] McDonald's. All rights reserved.
Used under license by [name of LICENSEE]

**A15.    Trademark Notice**: LICENSEE's trademarks shall be designated in accordance with local law and be submitted to AGENT for review.

**A16.    Payments:** All payments that exceed $500 (USD) shall be made by LICENSEE to AGENT, via wire transfer, in United States dollars, to the account of AGENT by wire transfer as specified below. All payments under $500 (USD) shall be made by check, payable to DIC Entertainment and sent to the Burbank, California address listed herein.

**Wire transfer instructions to AGENT:**
The Chase Manhattan Bank
1 Chase Manhattan Plaza
8th Floor
New York, NY 10081
Routing Number (ABA #): 021000021
Account Name: DIC Entertainment Corporation
Collection Account Number: 323-151-965

McDonald's-CRM

**A17.    Addresses for Notifications:**

If to LICENSEE:

China Retail Management Limited
Chinachem Golden Plaza
77 Mody Road
Floor UG2
Room UG202
Tsimshatsui East
Kowloon
Hong Kong
Attn: Henry Hu, Executive Director
Fax:

If to LICENSOR:

McDonald's Corporation
2915 Jorie Boulevard
Oak Brook, IL 60523
USA
Attn: Jackie Woodward, Vice President Worldwide Marketing
Fax: 630-623-7140
With copy to: General Counsel
Fax: 630-623-5011

If to AGENT:

DIC Entertainment Corporation
4100 West Alameda Avenue
Burbank, CA 91505
USA
Attn: Business & Legal Affairs
Fax: +1 (818) 955-5527

## A 18.    Complete Agreement

This License Agreement is made up of the Deal Terms, the Standard Terms and Conditions, and attached Exhibits. The parts are not separable and are taken as a whole. Each of the Deal Terms is modified by, and must be interpreted in light of, the Standard Terms and Conditions. The headings are for reference only and shall not change the meanings of any of the applicable terms and conditions as agreed by the parties herein.

McDonald's-CRM

### STANDARD TERMS AND CONDITIONS:

### ARTICLE I – DEFINITIONS

1.1     **Manufacturer:** shall mean any person or entity appointed by LICENSEE to manufacture Licensed Products or Materials (as hereinafter defined), bearing or incorporating elements of the Property, including, but not limited to, LICENSEE's third-party manufacturers, factories, suppliers and facilities (and all subcontractors of such third parties) which reproduce, incorporate or otherwise utilize the Property in conjunction with the Licensed Products, components of the Licensed Products, labels, hang-tags, packaging or any other item related to the Licensed Products.

1.2     **Net Sales:** shall mean the number of units of each Licensed Product sold by LICENSEE, multiplied by the Unit Price of such Licensed Product ("Gross Sales") less only (i) trade and quantity discounts actually given at the time of invoice, which may only exceed ten percent (10%) of Gross Sales on any customer invoice if LICENSEE has received LICENSOR's prior written approval, (ii) sales taxes (if any), and (iii) actual returns accepted for credit or exchange, not to exceed five percent (5%) of Gross Sales and which must be taken within two (2) calendar quarters following the date on which any sale of Licensed Products is made by LICENSEE. The "Unit Price" for a given Licensed Product shall mean the greater of (a) fifty percent (50%) of the retail sales price per unit for such Licensed Product and (b) LICENSEE's A-List Price for such Licensed Product as offered to its trade customers. Notwithstanding the foregoing, in the situations where the LICENSEE owns or controls the retail sales, the Unit Price for a given Licensed Product shall mean the greater of (a) the actual retail sales price of such Licensed Product, net of returns and (b) LICENSEE's A-List Price for such Licensed Product as offered to its trade customers. For purposes of this agreement, "control" of retail sales shall mean where LICENSEE or LICENSEE's agent handles the actual sale of the goods such that LICENSEE's revenue is based on the retail sales price rather than on wholesale/50% of retail price. Use of corporate averages or similar estimate for returns is expressly forbidden, and may not be used. No other deduction shall be made for any other reason, including, without limitation, cash payments, uncollectible accounts, or costs incurred in the manufacture, distribution, sale, exploitation or advertisement of the Licensed Products. Sales to any affiliated or related party shall be deemed to have been made at the Unit Price. Net Sales include any amounts or the value of other consideration received by LICENSEE in connection with the exploitation of the Licensed Products. With respect, however, to all sales of the Licensed Products which are shipped directly to customers for resale within the Licensed Territory where the terms of the sales to such customers are "f.o.b. [shipping point outside the country to which such Licensed Products are shipped]" ("FOB Sales"), the Royalty shall be increased by the number of percentage points over the then-applicable Royalty for other sales of the Licensed Products as indicated in the Deal Terms. In the event that LICENSEE sells any or all of the Licensed Products to any affiliate of LICENSEE, including, without limitation, any individual(s) entity(ies) in whole or in part controlled by LICENSEE, or having any relationship, contract or arrangement with LICENSEE with respect to any matter which affects, or is affected by, this Agreement, the amount used to determine Net Sales hereunder shall be the greater of either (1) the highest amount that LICENSEE receives for such sales from independent third parties, or (2) the highest amount at which such Licensed Products are resold by such individual or entity to an unrelated customer in an arm's-length transaction.

1.3 **Quarterly Periods:**          Except as provided otherwise herein, each Quarterly Period shall consist of a three (3) month period ending March 31, June 30, September 30 and December 31 of each Contract Year. If a partial Quarterly Period is included in the Licensed Term,

McDonald's-CRM

such partial Quarterly Period shall be treated as though it were a complete Quarterly Period, commencing on the date such partial Quarterly Period commences and ending on the date such partial Quarterly Period ends.

## ARTICLE II - SCOPE OF THE LICENSE

2.1     **Sales and Distribution of the Licensed Products:**

(a)     LICENSEE shall not sell or distribute, nor shall LICENSEE authorize any third party to sell or distribute, the Licensed Products to any person or entity:

(i) which LICENSEE knows or has reason to believe, would sell or distribute the Licensed Products outside the Licensed Territory or to any person or entity other than an Authorized Channel of Distribution;

(ii) in any country within the Licensed Territory unless and until LICENSEE has presented to AGENT a business plan with respect to each such country, and AGENT has approved such business plan in writing; or

(b)     LICENSEE shall not sell or otherwise provide or authorize any third parties to sell or otherwise provide the Licensed Products for use as premiums, promotions, giveaways, self-liquidator programs, fund-raisers or sweepstakes without the prior written approval of LICENSOR.

(c)     LICENSEE shall maintain an adequate sales force devoted to the promotion and marketing of the Licensed Products.

(d)     LICENSEE agrees and acknowledges that the Licensed Products shall be available for distribution for delivery to customers no earlier than the Commencement Date, but not later than the Distribution Deadline. In the event that (i) the Licensed Products are offered for distribution for delivery to customers before the Commencement Date or (ii) a commercially reasonable quantity of Licensed Products are not delivered to LICENSEE's Authorized Channels of Distribution on or before the Distribution Deadline, then LICENSEE shall be deemed to have breached this Agreement, and such breach shall be deemed incurable.

(e)     LICENSEE shall consistently distinguish the Licensed Products from all other products manufactured and sold by or for LICENSEE. Without limiting the generality of the foregoing, LICENSEE shall take such actions as are necessary to maintain the Licensed Products as separate and distinct lines from all other products manufactured, sold or distributed by or for LICENSEE.

(f)     LICENSEE acknowledges that there is substantial goodwill associated with the Property including goodwill based, in part, on the quality attributes associated with the Property and consumers' ongoing perception of that quality image. In order to perpetuate and protect such goodwill, LICENSEE agrees to use all commercially reasonable efforts to present the Licensed Products through pricing and price advertising, including a standard list price that is consistent with that image, subject to LICENSEE's normal marketing practices for other quality trademarked products. LICENSEE will consult with AGENT from time to time, and in advance of each season, to obtain its input and recommendations as to such matters. Furthermore, in an effort to assist LICENSOR in maintaining the quality and furthering the goodwill of the Property, LICENSEE shall be responsible to review the specific retail locations to which LICENSEE and its

- 10 -

McDonald's-CRM

Sub-LICENSEEs distribute the Licensed Products to ensure that all retail destinations adhere to these standards. Specifically, retail destinations must be "family-friendly" and shall not carry products of such a nature as to possibly damage the quality image of the Property in the public perception.

(g)     LICENSEE shall not be permitted to sell seconds or irregulars of the Licensed Products without the prior written consent of LICENSOR or AGENT. LICENSEE shall, however, be entitled to sell "Closeouts" which are defined as either (a) any discontinued product or stock keeping unit ("SKU") or (b) any Licensed Products sold at an amount equal to less than eighty percent (80%) of (i) LICENSEE's normal wholesale price for such Licensed Products as indicated by LICENSEE in its price lists or (ii) the highest price charged by LICENSEE during the Licensed Term. All Earned Royalties shall be due on such Net Sales of Closeouts. However, such Net Sales of Closeouts shall not apply against the Minimum Net Sales, nor shall payments apply against the Guaranteed Minimum Royalty due in any Contract Year. In the event that the percentage of Closeouts of Licensed Products exceeds five percent (5%) of LICENSEE's total Net Sales in any Contract Year, then LICENSEE shall be deemed to have breached this Agreement.

(h)     LICENSEE shall not grant any retailer within an Authorized Channel of Distribution the right to purchase the Licensed Products on an exclusive basis unless such Licensed Product is manufactured specifically on order from such retailer. In addition, LICENSEE shall not require any retailer within an Authorized Channel of Distribution to purchase any merchandise or service other than the Licensed Products as a condition to being able to purchase the Licensed Products.

(i)     LICENSEE agrees that it will cooperate and communicate with AGENT and LICENSOR. LICENSOR has authorized AGENT to assist LICENSOR in managing the implementation of this Agreement, as well as other license agreements regarding LICENSOR's licensing program in the Licensed Territory, as set forth herein and by assisting with the following:

(i)     acting as liaison with the licensees to facilitate adherence to LICENSOR's product development approval process;

(ii)     managing licensee relationships with retailers;

(iii)     collaborating with licensees to develop products that satisfy LICENSOR's creative, legal, brand marketing, quality, safety and style guide requirements;

(iv)     monitoring sales of Licensed Products;

(v)     receiving suggestions from licensees to improve the licensing program;

(vi)     holding meetings to discuss the direction of the brand and merchandising direction; and

(vii)     preparing reports on the competition.

2.2     **Manufacture of the Licensed Products:**

(a)     LICENSEE agrees to provide AGENT with the names and addresses of all of its Manufacturers of the Licensed Products. In the event that LICENSEE desires to have the

McDonald's-CRM

Licensed Products or components thereof manufactured by a third-party Manufacturer, LICENSEE shall notify AGENT in writing of the name and address of such Manufacturer. AGENT shall have the right to approve each such third-party Manufacturer. LICENSEE shall be required to enter into an agreement with each such Manufacturer (including without limitation, LICENSEE's own facilities), the terms of which agreement shall be identical to the Form Manufacturer Agreement set forth in Exhibit A and shall be subject to the prior written approval of AGENT. Each Manufacturer (including, without limitation, LICENSEE's own facilities) shall also be required to comply with McDonald's Corporation Code of Conduct for Suppliers ("Code of Conduct") as set out in Exhibit B, which is hereby incorporated into this Agreement and shall be incorporated into each Manufacturer's Agreement. LICENSEE shall forward to LICENSOR two (2) fully executed originals, with copy to AGENT, of each Manufacturer's Agreement within ten (10) days after the execution thereof by the parties.

(b)     LICENSOR shall have the right to monitor the activities of all Manufacturers, including unannounced on-site inspections of all manufacturing facilities according to the terms identified in the Code of Conduct. All costs relating to such inspections, including, but not limited to, LICENSOR's agents' costs of travel and lodging, shall be at LICENSEE's sole expense, not to exceed $1,500.00 per inspection. Such inspections shall not occur more than once in any Contract Year unless a Manufacturer failed to pass such inspection and LICENSOR's agents re-inspect to determine if such failure has been cured. If any Manufacturer fails to pass any such inspection, or if any Manufacturer otherwise breaches the Manufacturer's Agreement, then without prejudice to any rights that LICENSOR may have against LICENSEE, such Manufacturing Agreement may be terminated by LICENSOR and LICENSEE shall not thereafter use such Manufacturer to manufacture the Licensed Products or components thereof.

(c)     LICENSEE also agrees to execute and comply with the Code of Conduct.

## 2.3    Sub-Licensing Rights

(a)     For the Term of this Agreement, with exceptions otherwise set forth herein, LICENSOR grants to LICENSEE the exclusive right to represent LICENSOR and AGENT in the implementation of a plan to manufacture and merchandise the Licensed Products within the Licensed Territory. Pursuant to this purpose, LICENSOR grants to LICENSEE the right to use third-party sub-licensees (the "Sub-LICENSEEs") according to the following:

(i)     LICENSEE shall seek out the best potential Sub-LICENSEEs for the Property in terms of financing, manufacturing, and marketing a quality item in the product areas for which a sub-license will be granted. This shall include an in-depth review of the potential Sub-LICENSEEs' positions within the industry involved and a personal inspection by LICENSEE of the Sub-LICENSEE's local facilities on an as needed basis.

(ii)     Subject to LICENSOR's and AGENT's approval rights as set forth below, LICENSEE shall negotiate the business terms and conditions of a sublicense long form agreement (the "Sub-License Agreement"). LICENSEE shall notify all potential Sub-LICENSEEs in writing that any development or other costs incurred before (1) the parties fully execute a Sub-License Agreement for the property and before (2) such Sub-LICENSEE remits any Advance payments to the LICENSEE, shall be incurred at the sole risk of the potential Sub-LICENSEE. In the event that the parties are unable to reach such agreement, LICENSOR and AGENT shall not be responsible for any such costs.

(A)     LICENSEE shall submit to AGENT a completed License Application (as set forth in the attached Exhibit D) for each potential Sub-LICENSEE. LICENSOR shall have sole discretion to approve each potential Sub-LICENSEE.

(B)     Upon LICENSOR's approval of a potential Sub-LICENSEE and the terms of the Sub-License Agreement, LICENSEE and Sub-LICENSEE shall enter into a long-form license agreement. The terms and conditions of any sub-license agreement shall be consistent with the terms approved by LICENSOR and shall grant to LICENSOR the right to conduct any safety or social accountability audit or review as LICENSOR deems necessary as part of a review of LICENSEE's facilities, and LICENSEE shall be responsible for all applicable costs and expenses associated with such audits. The Sub-License Agreement shall not be for a term longer than the Term of this Agreement without LICENSOR's prior written consent. In no event shall LICENSEE take any action which would bind or obligate LICENSOR and/or AGENT without LICENSOR's and/or AGENT's express prior written consent respectively.

(iii)     LICENSEE shall monitor and oversee the licensing program with its Sub-LICENSEEs to ensure that the Sub-LICENSEEs' royalties, minimums, and sales reports are promptly submitted. LICENSEE shall collect, on behalf of AGENT, all such payments and reports due under the Sub-License Agreements during the Term of this Agreement. After receipt of any Sub-LICENSEE payments, LICENSEE shall be entitled to deduct its percentage compensation, as set forth in Paragraph A10, calculated on the monies acutally received by Sub-LICENSEE, and shall then remit the balance of the payment to AGENT as Royalties as more fully provided for in Article III. Any Marketing Fund Payments shall be accounted for separately, and LICENSEE shall not be entitled to retain any portion of Marketing Fund payments made by Sub-LICENSEEs. After the expiration of this Agreement, LICENSEE shall be entitled to an ongoing compensation based on Sub-License Agreements within the Licensed Territory which were negotiated and closed by LICENSEE during the term of the Agreement for a period not to exceed six (6) months. The ongoing compensation shall only apply to the original terms, extensions, or renewals of Sub-License Agreements actually negotiated and closed by LICENSEE as set forth above, and shall not apply to any future extensions or renewals.

(iv)     In the event of termination of this Agreement by LICENSOR, any existing Sub-License Agreements and the obligations arising therefrom shall survive the termination of this Agreement, subject to the following:

(A)     All future royalty payments made by Sub-LICENSEEs shall be made directly to AGENT.

(B)     LICENSEE shall not be entitled to retain any ongoing compensation which would have been derived from any Sub-License Agreements.

(b)     LICENSEE's exclusive rights shall be subject to Shanghai Longtrust ("SOHO") becoming a Sub-LICENSEE of LICENSEE, subject to the terms and conditions of a Sub-License Agreement to be negotiated between the parties. In the event that SOHO and LICENSEE are unable to reach agreement on terms of a Sub-License Agreement and/or in the event LICENSOR does not approve SOHO as a Sub-Licensee on the terms set forth therein, and as a result LICENSOR elects to terminate SOHO, LICENSEE shall not be held liable for any damages, including but not limited to remaining inventory, incurred as a result of this termination.

McDonald's-CRM

**Best Efforts:**

(a)      At all times throughout the Licensed Term, LICENSEE shall use its best efforts to exploit the license granted herein throughout the Licensed Territory, including, but not limited to, continuously manufacturing, sourcing, distributing and selling quantities sufficient to meet market demand of each of the Licensed Products throughout the Licensed Territory, offering for sale Licensed Products so that they may be delivered to the Authorized Channels of Distribution on a timely basis, and maintaining a sales force sufficient to provide effective distribution of the Licensed Products throughout the entire Licensed Territory.

(b)      LICENSEE recognizes that the Property is associated with LICENSOR on a worldwide basis and, therefore, LICENSEE shall, throughout the Licensed Term, constantly use its best efforts in its advertising, promotion, sale, distribution, and in all other dealings with or disposal of the Licensed Products (i) to protect the good name and goodwill associated with the Property, and with the LICENSOR, and (ii) secondarily, to obtain the greatest Net Sales in the entire Licensed Territory throughout the entire Licensed Term. Should LICENSEE directly or indirectly take any action or actions which negatively affect or impact the good name, goodwill or reputation of the Property or LICENSOR, LICENSOR may deem such to be an incurable breach by LICENSEE of this Agreement.

(c)      If LICENSEE has multiple product categories in its Licensed Products, and fails to ship any single approved product of the Licensed Products within any particular product category in commercially reasonable quantities for a consecutive period of ninety (90) days during the Licensed Term, without LICENSOR's consent, LICENSOR shall have the right, but not the obligation, to eliminate such product category in its entirety from the definition of the Licensed Products while leaving the balance of this Agreement in full force and effect, and grant such rights to another party. Notwithstanding the foregoing, LICENSEE shall not be required to ship product in advance of the roll-out dates for each product category set forth in any business plan for which LICENSOR and/or AGENT have given written approval.

2.4      **LICENSOR's Reservation of Rights:** LICENSOR hereby reserves all rights in the Property not expressly and exclusively granted herein to LICENSEE.

2.5      **Consumer Complaints:** LICENSEE shall exercise its best efforts to promptly resolve any consumer complaints it receives regarding the quality or performance of any Licensed Product, and shall periodically report such complaints and LICENSEE's resolution of them to LICENSOR and AGENT. LICENSEE shall notify LICENSOR and AGENT immediately of any complaints it receives regarding the Licensed Products that involve or claim bodily injury, death or serious property damage. LICENSOR reserves the right to resolve or participate in the resolution of all complaints, but the exercise of such right does not relieve LICENSEE of its indemnification or other obligations hereunder. LICENSEE shall cooperate with LICENSOR in the resolution of all complaints.

## ARTICLE III – PERFORMANCE, PAYMENTS AND REPORTS

3.1      **Minimum Net Sales:** For each particular Contract Year throughout the Licensed Term, LICENSEE shall be required to achieve the Minimum Net Sales set forth in this Agreement. In the event that LICENSEE fails to achieve the Minimum Net Sales in any Contract Year throughout the Licensed Term, then, LICENSOR shall have the right, but not the obligation, to deem such failure an incurable breach of this Agreement.

McDonald's-CRM

3.2    **Earned Royalty**: To the extent the Earned Royalty for a given Quarterly Period or Contract Year, as applicable, exceeds the amount of the GMR due for such period, then within thirty (30) days following such period, LICENSEE shall account for and pay such excess Earned Royalty to AGENT, for the benefit of LICENSOR, based on LICENSEE's Net Sales in such period throughout the Licensed Term.

3.3    **Guaranteed Minimum Royalties (GMR)**: For each particular Contract Year throughout the Licensed Term of this Agreement, LICENSEE shall pay the greater of either (i) the GMR due for that Contract Year or (ii) the Earned Royalty due based on LICENSEE's Net Sales during that Contract Year.

3.4    **Payment Requirements:**

(a)    Unless agreed otherwise, all payments payable under this Agreement to LICENSOR or AGENT shall be paid in U.S. Dollars, converted from any local currency at the official telegraphic transfer rate published by Reuters as of the last day of each Quarterly Period for which payments are due, and shall be remitted via wire transfer, with copies of evidence of each and every such payment, regardless of the payee's identity, sent to both LICENSOR and AGENT, and to any other person or entity as may be designated by LICENSOR or AGENT to LICENSEE in writing.

(b)    If LICENSEE fails to make any payment on the date such payment is due, then, without prejudice to any other rights or remedies that LICENSOR may have against LICENSEE, LICENSEE shall pay interest on the deficiency of the amount due at the rate of eighteen percent (18%) per annum or a rate equal to two (2) percentage points above the prime rate per annum being charged by the Chase Manhattan Bank in New York, New York or the maximum allowable amount permitted by law, whichever is greater, as of the close of business on the date such payment becomes due (but not more than the maximum rate of interest which legally can be paid by any such entity). Such interest shall accrue as of the day such deficiency in payment arose until the date such amount is paid in full.

(c)    If, during any Contract Year, LICENSEE is late making two (2) or more payments of any amounts due under this Agreement, then, without prejudice to any other rights and remedies that LICENSOR may have against LICENSEE, LICENSOR shall have the right to require LICENSEE to obtain an irrevocable standby letter of credit in favor of LICENSOR and AGENT on terms and in the form and content as directed by LICENSOR to secure all future financial obligations of LICENSEE under this Agreement. All costs and expenses associated with such letters of credit, including, but not limited to, opening, amending and drawing fees, shall be borne by LICENSEE. LICENSEE shall provide such letter of credit, within ten (10) days from the date of LICENSOR's demand for same.

3.5    **Reports and Statements:**

(a)    Within thirty (30) days following the close of each Quarterly Period throughout the Licensed Term, and concurrently with the remittance of the payments required to be paid at such time, LICENSEE shall submit to LICENSOR and AGENT a written report (with copies to any other person or entity as LICENSOR may designate), to be divided out separately by country, on a form provided by LICENSOR (annexed hereto as Exhibit C), relating to and including a calculation of the Net Sales made by LICENSEE during said Quarterly Period, which

- 15 -

shall include a breakdown of sales by account/customer as well as by the individual stock keeping unit (SKU) shipped, and a statement as to the calculation of the payments made, regardless of whether any payments are due and any permitted deductions taken by LICENSEE. LICENSOR may, upon notice to LICENSEE, change the report form at its discretion from time to time. Each report must be fully and accurately completed, and signed and certified as accurate by LICENSEE's Chief Financial Officer. In addition, within ten (10) days of each request of LICENSOR or AGENT, LICENSEE shall provide LICENSOR and AGENT with any additional documentation requested in connection with any report, including without limitation, copies of all invoices, purchase orders and other sales and shipping documents.

(b)    In the event of any inquiry by LICENSOR or AGENT regarding any such report, LICENSEE shall promptly comply with such request for information in the manner requested.

(c)    If any payment due pursuant to this Agreement is received without a report, or with an incorrect or incomplete report, such payment may be accepted without prejudice to any of the rights and privileges hereunder.

## ARTICLE IV - QUALITY CONTROL

### 4.1    Product Quality:

(a)    At all times throughout the Licensed Term, LICENSEE shall create, develop, merchandise and offer for sale a complete line of Licensed Products covering each product category set forth in this Agreement. LICENSEE acknowledges that the continued maintenance of the significance and the value of the Property and its associated goodwill, the continued maintenance of the high quality standards, and the merchandising and coordination of the Licensed Products associated with the Property are all essential elements of the license granted herein. LICENSEE hereby warrants and agrees that the Licensed Products designed, manufactured, advertised, promoted, sold and distributed under this Agreement shall bear the Property faithfully produced and shall meet the high standards of quality, workmanship, material, design, size, color and style established by LICENSOR. LICENSOR shall have the option, each season, to provide LICENSEE with design and merchandising direction for each such season, including, without limitation, design, color themes, and other specifications to be utilized by LICENSEE in connection with the Licensed Products. LICENSEE's compliance with any standards provided by LICENSOR shall not relieve LICENSEE of any of its obligations to ensure that the Licensed Products comply with all applicable laws, are safe and merchantable and are of high quality.

(b)    LICENSEE will not knowingly or negligently cause or authorize any or all of the Licensed Products not conforming to this Agreement to be sold or distributed, as doing so may adversely affect the goodwill in the Property. All of the Licensed Products shall conform to and comply with, in all respects, all applicable national and local laws, rules, regulations and industry standards governing and/or directed toward the design, quality, labeling and safety of such Licensed Products. LICENSEE shall not cause, condone or authorize: (i) the use of any substandard or offensive materials on or in connection with any or all of the Licensed Products; or (ii) any violation of any national or local law, rule, or regulation, including, but not limited to, provisions thereof imposing advertising standards or requiring trade or content description of or labeling requirements related to the Licensed Products.

- 16 -

McDonald's-CRM

(c)    Failure of LICENSEE to comply with this Section 4.1 shall constitute an incurable breach, which shall give LICENSOR the right, but not the obligation, to immediately terminate the contract.

4.2    **Approval of the Licensed Products and Materials:** Unless stated otherwise in writing, submissions and approvals shall be coordinated by AGENT, at the address listed in the Deal Terms. Unless otherwise stated in writing, LICENSOR hereby appoints AGENT to act as LICENSOR'S designee for approvals and submissions under this and subsequent sections of Article IV. LICENSEE understands and agrees that each of the Licensed Products and any items bearing the Property or intended for use in connection with the Licensed Products (hereinafter collectively referred to as the "Materials") must be approved in advance and in writing by AGENT. The Materials include, without limitation, labels, hangtags, cartons, containers, wrappers, packages and other inner and outer packaging materials, fixtures, displays, signage, artwork and printing, advertising, stationary, and sales, marketing and promotional materials. LICENSEE shall, at its own expense, submit to AGENT for written approval, samples of each of the proposed Licensed Products and Materials in accordance with the following:

(a)    In order for each product style to become a Licensed Product and in order to obtain the authorization to use the Property in connection with any Materials, LICENSEE must receive written approval from AGENT for that product style or Material in each of the following three (3) stages: (i) the initial concept, imaging, or renderings; (ii) a three dimensional model, sample prototype, or equivalent acceptable to AGENT; and (iii) twelve (12) samples as actually manufactured or produced in final form as intended to be sold and distributed by LICENSEE within five (5) business days after their initial production, and prior to distribution to the public. In the case of any Materials, in the final form intended to be utilized by LICENSEE, LICENSEE must obtain AGENT's written approval of each stage of development before proceeding to the next stage.

(b)    To obtain the approval of AGENT, LICENSEE shall submit samples of the proposed Licensed Product and/or proposed Materials along with a completed written approval form provided by AGENT (the "Approval Form"), together with all information required by AGENT. AGENT shall have the sole and absolute discretion to approve or withhold approval of any and all of the Licensed Products and Materials throughout each stage of development. In the event AGENT fails to provide its approval of any or all proposed products or Materials submitted to AGENT pursuant to this paragraph within fourteen (14) business days of AGENT's receipt thereof, AGENT shall be deemed to have disapproved of such items. In no event shall LICENSEE commence or permit the manufacture, advertising, promotion, sale or distribution of any or all of the proposed Licensed Products or the proposed Materials unless and until LICENSEE has received AGENT's prior written approval of the items submitted in accordance with this paragraph.

(c)    Any disapproved product or aspect relating to its physical characteristics thereof shall not be used by LICENSEE, but may be resubmitted in altered form for AGENT's approval in accordance with the procedures specified herein.

(d) Any approval granted by AGENT shall only be limited to the specific time period stated in the Approval Form and shall not extend beyond its permitted period of use. With respect to proposed Licensed Products, no approval shall extend beyond the seasonal period for which the approval is granted and in the event that LICENSEE intends to utilize any style for any subsequent seasons or collections, such style shall be re-submitted for the prior written approval of AGENT. Furthermore, any approval granted by AGENT shall be limited to the specific territories listed on the Approval Form.

- 17 -

McDonald's-CRM

(e)    No modification of an approved Licensed Product or Material shall be made without the prior written consent of AGENT. All SKUs of the Licensed Products being sold and all representations of the Materials must conform in all respect to the approved samples. If, in AGENT's judgment, the quality of any SKU of a Licensed Product or the quality of any Material originally approved has deteriorated, or if any SKU or Material has been altered or modified, LICENSOR shall have the right, without prejudice to any other remedies available, to require, by written notice to LICENSEE, that such SKU of the Licensed Product or such Material be immediately withdrawn from the market at LICENSEE's sole cost and expense.

(f)    LICENSEE shall be responsible for all costs incurred by LICENSEE, AGENT and/or LICENSOR in connection with the development or formatting of artwork and other materials related to the Property for the Licensed Products or the Materials (including artwork developed by third parties and including any artwork which in AGENT's opinion is necessary to modify artwork initially proposed by LICENSEE and submitted for approval). LICENSEE shall pay AGENT within thirty (30) days of receiving an invoice therefor, at AGENT's then prevailing commercial rates. Estimates of artwork charges will be available upon request. While LICENSEE is not obligated to utilize the artwork services of AGENT, LICENSEE is encouraged to do so in order to minimize delays which may occur if outside artists do renditions of the Property (particularly third party artists).

(g)    Failure of LICENSEE to comply with this Section 4.2 shall constitute an incurable breach, which shall give LICENSOR the right, but not the obligation, to immediately terminate the contract.

4.3    **Post-Production Samples:**

(a)    To ensure that each of the Licensed Products and the Materials are constantly maintained in conformance with the previously approved samples, LICENSEE shall, within seven (7) days of receipt of any request from AGENT, send or cause to be sent to AGENT at LICENSEE's expense: (a) a reasonable number of such actual samples requested by AGENT of the Licensed Products and the Materials LICENSEE is manufacturing, selling, distributing or otherwise utilizing, and (b) a listing or revised listing of each location where any of the Licensed Products and the Materials or either thereof are created, designed, manufactured or stored. AGENT and/or AGENT's designee shall have the right, with 48 hours prior notice, to enter upon and inspect, during business hours, any and all such location(s) and to take, without payment, no more than 12 samples of any of the Licensed Products and the Materials as AGENT reasonably requires for the purposes of such inspection

(b)    If, as a result of the inspection provided for above, or if AGENT otherwise becomes aware that the Licensed Products or Materials do not conform in the opinion of AGENT to the previously approved samples, AGENT shall so notify LICENSEE, in writing, specifying in what respect such of the Licensed Products or Materials are unacceptable. Immediately upon receipt of such notice, LICENSEE shall suspend all manufacture, sale and distribution of and shall obtain the return from LICENSEE's customers, all such Licensed Products and Materials; and shall immediately cease all distribution thereof unless and until LICENSEE has made all necessary changes to the satisfaction of AGENT and has received AGENT's written re-approval of each of such Licensed Products and Materials. All of the Licensed Products and the Materials that are not approved by AGENT or that are determined by AGENT to be non-conforming or unacceptable or violate any law, shall not be sold or distributed by LICENSEE. All such Licensed Products and Materials shall be destroyed by LICENSEE at LICENSEE's sole cost and expense and a

- 18 -

representative of AGENT may attend the destruction of such Licensed Products; or LICENSEE shall document the destruction through photographic and/or videotaped footage or LICENSEE shall provide AGENT with an appropriate certificate of destruction attesting to the destruction signed by an officer of LICENSEE.

(c)    Such inspections shall occur no more frequently than once in any 12 month period, unless inspection shows non conformity to previously approved samples, in which event LICENSOR shall have the right to additional inspections until such time as LICENSOR is satisfied that Licensed Products again conform.

(d)    Due to the great value of the goodwill associated with the Property, any and all sale, distribution or use by LICENSEE of unapproved or non-conforming Licensed Products or Materials shall constitute an incurable breach under the terms of this Agreement.

4.4    **Safety Testing and Compliance with Laws:**

(a)    LICENSEE shall, at its own cost, have tests performed by Bureau Veritas, RAM Consulting, or another independent testing laboratory acceptable to LICENSOR, demonstrating that the Licensed Product is in compliance with all applicable national and local laws, rules, regulations and industry standards governing and/or directed toward the Licensed Product. Furthermore, LICENSEE shall comply with LICENSOR's own safety standards as set forth in McDonald's Retail Licensing Safety Testing manual. LICENSEE shall sign the McDonald's Corporation Safety Approval Process for Retail Consumer Products attached hereto as Exhibit E. LICENSEE acknowledges that the information in Exhibit E does not specify the procedures to be followed by Licensee to obtain safety approval for a product, but rather facilitates Licensee's understanding of the process. The offering for sale or sale of any products bearing or sold under the McDonald's Property without prior written acknowledgement from LICENSOR or from its designated representative that such product(s) have passed the required safety testing shall be a material breach and will give LICENSOR the right to immediately terminate the Agreement. LICENSOR's safety standards are subject to change and modification, at LICENSOR's discretion. All questions regarding testing and the standards should be directed to Bureau Veritas or RAM Consulting.

(b)    Safety testing performed in accordance with the above shall authorize the distribution and/or sale of the tested item for twelve (12) months from the date of the test. Further sales of the tested product after that date shall require the tested product to be resubmitted for testing.

(c)    It is acknowledged and agreed that the independent testing company is not the agent of LICENSOR, and that favorable test reports will neither be conclusive or binding as against LICENSOR, nor will LICENSOR's authorization of purchase or approval of any Product relieve LICENSEE of any liability, indemnification or other obligation hereunder.

(d) Failure of LICENSEE to comply with this Section 4.4 shall constitute an incurable breach, which shall give LICENSOR the right, but not the obligation, to immediately terminate the contract.

**ARTICLE V - USE OF TRADEMARK, COPYRIGHT AND OTHER RIGHTS**

McDonald's-CRM

5.1    **Ownership Rights:**

(a)    All rights in and arising from the Property (including, without limitation, trademark, trade dress, design, patent and copyright rights), other than the user trademark rights specifically granted herein, are reserved to LICENSOR. Any such rights which may arise in connection with LICENSEE's use of the Property shall be the property of LICENSOR; provided, however, that LICENSEE shall have the right, to the extent necessary in exercising its rights as LICENSEE hereunder, to the use of such rights during the Licensed Term only in the Licensed Territory and only in connection with the Licensed Products.

(b)    All uses of the Property by LICENSEE and any rights that may arise therefrom shall inure to the sole and exclusive benefit of LICENSOR. All right, title and interest to any additional intellectual property associated with any Licensed Product or Materials pursuant to the terms of this Agreement (including, without limitation, all other trademarks, designs, patents and copyright rights) inextricably entwined and associated with the Property, designs or other intellectual property of LICENSOR in such a manner that such other trademarks, designs, patents and copyrights rights cannot exist on their own or with other licensed intellectual properties, trademarks or designs (all of which shall be referred to as "Required Ceded Rights") shall entitle LICENSOR to the ownership and use of such Required Ceded Rights in any manner LICENSOR may deem beneficial to the exploitation of its Property anywhere in the world. LICENSEE agrees and acknowledges that all trademarks, designs, patents, copyrights and all other intellectual property comprising Required Ceded Rights utilized in conjunction with the Licensed Products and/or Materials, whether or not created by LICENSEE or any third party during the Licensed Term, are and shall remain the property of LICENSOR notwithstanding the expiration or termination of this Agreement and LICENSOR shall have the unrestricted right to utilize the Required Ceded Rights in any manner that it deems appropriate.

(c)    In furtherance of the provisions set forth in this paragraph, LICENSEE hereby assigns and transfers to LICENSOR all of its right, title and interest, including, without limitation, ownership of all rights under and trademarks, copyrights, trade dress, patents, and/or design patents created for or associated in any way with the Required Ceded Rights, the Licensed Products and Materials, and any copyright in and to all advertisements, television or radio commercials, labels, hangtags, packaging, promotion pieces or any other Material produced or created hereafter by or for LICENSEE which may bear or contain any elements of the Property. The effective date of such transfer and assignment shall be the date on which the Materials were created. To the extent that rights in any of such Materials produced for LICENSEE may be in third persons, LICENSEE will obtain and deliver to LICENSOR assignments of said rights from said third persons to LICENSOR effective as of the date of creation of such materials in order that such rights in such Materials will fully vest in LICENSOR.

(d)    LICENSEE acknowledges that it shall not, at any time throughout the Licensed Term, manufacture, market, sell or otherwise distribute any products containing the Required Ceded Rights without the prior written consent of LICENSOR.

(e)    Whenever requested by LICENSOR, whether during the Licensed Term or thereafter, LICENSEE shall execute such documents or applications as LICENSOR may deem necessary or appropriate to confirm LICENSOR's ownership of all such Required Ceded Rights, to maintain the validity of the Property, or to obtain or maintain registrations thereof.

- 20 -

5.2    **Protection and Use of the Property:**

(a)    LICENSEE hereby acknowledges each of the following: the great value of the goodwill associated with the Property; the worldwide recognition and fame thereof; that the proprietary rights therein and goodwill associated therewith are solely owned by and belong to LICENSOR; that the Property and other related words, devices, designs and symbols are inherently distinctive or have secondary meaning firmly associated in the mind of the general public with LICENSOR, its subsidiaries and affiliates and its or their activities; and that all additional goodwill associated with the Property created through the use of such Property by LICENSEE shall inure to the sole benefit of LICENSOR.

(b)    During and after the Licensed Term,

(i)    LICENSEE shall not:

(A)    attack, challenge or question the validity of, or assist any individual(s), entity or entities in attacking, challenging or questioning, the title or any rights of or claimed by LICENSOR, its subsidiaries and affiliates and licensees and sublicensees in and to the Property or any other trademark(s), copyright(s) or such other intellectual or intangible property or properties associated or connected with LICENSOR, its subsidiaries and affiliates, their publications, published material, activities, licensees and sublicensees;

(B)    directly or indirectly seek for itself, or assist any third party or parties to use or acquire, any rights, proprietary or otherwise, in any patent, trademark, copyright or such other intellectual or intangible property so associated or connected, or in any way similar to the Property, without the prior written approval of LICENSOR;

(C)    in any way seek to avoid LICENSEE's duties or obligations under this Agreement because of the assertion or allegation by any individual(s), entity or entities that any or all elements of the Property are invalid by reason of any contest concerning the rights of or claimed by LICENSOR;

(D)    file or prosecute one or more trademark applications regarding LICENSEE's use of the Property anywhere in the world, unless first requested to do so in writing by LICENSOR;

(E)    use or permit the use of the Property in any manner or form unless such manner or form has been approved by LICENSOR in writing pursuant to the provisions of Article IV; moreover LICENSEE shall not use or permit the use of any variation of the Property (including, without limitation, any similar logos, designs or graphics or any derivations of the Property) unless such variation is also approved in writing by LICENSOR.

(F)    use or permit the use of any elements of the Property in any corporate, trade, or partnership name, either alone or in conjunction with any other words in any style or manner;

(G)    except as expressly described hereinabove, use the Property in connection with, or juxtaposed to LICENSEE's name or name of any affiliated company without LICENSOR's prior written consent;

McDonald's-CRM

(H)    except as expressly described hereinabove, use any elements of the Property in connection with or juxtaposed to any other trademark, trade name, or business name on any Licensed Products or Materials without LICENSOR's prior written consent; and

(I) except as expressly described hereinabove, and subject to the requirements of all laws, use its name or the name of any affiliated company or any other name, logo or trademark in any way on or in connection with any Licensed Products or advertising bearing elements of the Property.

(ii)    LICENSEE shall:

(A)    use the Property as permitted under this Agreement in each jurisdiction strictly in accordance with the legal requirements in such jurisdiction; and

(B)    affix or imprint irremovably and legibly on each of the Licensed Products and on or within all of the Materials such trademark notices, copyright notices, and legends as LICENSOR directs.

(c)    Upon written notice from LICENSOR to LICENSEE, LICENSOR may change, in its sole discretion, such approved form, color, and manner of use of elements of the Property, and LICENSEE must comply with said changes once all remaining inventory of Licensed Products are distributed and once all remaining inventory of Materials are utilized by LICENSEE. LICENSEE shall provide a detailed accounting of such inventory and proof of commitment within ten (10) days of receipt of such written notice.

5.3    **Cessation of Rights:** Subject only to LICENSEE's rights, if any, to sell-off its then existing inventory of Licensed Products in accordance with the provisions of this Agreement, upon expiration or termination of this Agreement for any reason whatsoever, all rights and approvals herein granted to LICENSEE shall cease and all rights shall automatically revert to LICENSOR. Except as may be permitted during the Sell-Off Period, LICENSEE shall then immediately discontinue any and all uses of the Property, and shall not thereafter use any elements of the Property or any confusingly similar or dilutive marks, names or trade dress.

5.4    **Registration of Agreement:** Where required by law within any country within the Licensed Territory, LICENSEE shall register, record or file this Agreement with the applicable governmental authority, and shall be responsible for all costs, fees and expenses associated thereto. To the extent that any registration, recording or filing must be renewed during the Term, LICENSEE shall also be responsible for such renewal and all costs associated therewith.

## ARTICLE VI - MARKETING PARTICIPATION

6.1    **Sales to LICENSOR:** Upon the written request of LICENSOR or AGENT at any time throughout the Licensed Term, LICENSEE shall sell to LICENSOR or AGENT any of the Licensed Products requested at LICENSEE's manufactured cost for such Licensed Products, plus ten percent (10%). No Earned Royalty Payments shall be due on such sales, and such sales shall not be included in LICENSEE's calculation of Minimum Net Sales.

6.2    **Business and Marketing Plans:** Within ten (10) days following the commencement of each Contract Year throughout the Licensed Term, LICENSEE will provide LICENSOR and AGENT with a comprehensive business and marketing plan detailing

- 22 -

LICENSEE's plans for the manufacture, sale, distribution, advertising and promotion of the Licensed Products during the extant Contract Year. Such plan shall include information pertaining to the number of styles of each Licensed Product within each product category that LICENSEE intends to manufacture and sell, the intended distribution to Authorized Channels of Distribution by retail account and the projected sales on a category by category basis as well as any other information that LICENSOR may request to be included in such plan.

## ARTICLE VII - LICENSEE'S BOOKS AND RECORDS

7.1    **Proper Books and Records:**

(a)    LICENSEE shall maintain complete books of account and records, in accordance with generally accepted accounting principles (including, without limitation, a sales journal, sales return journal, cash receipt book, general ledger, purchase orders, cutting tickets, and inventory records) and shall make accurate entries concerning all transactions relevant to this Agreement.

(b)    The Licensed Products shall be assigned style numbers unique from any other products offered for sale by LICENSEE. The style number assigned to each Licensed Product shall be identical to the style number utilized to identify that Licensed Product in all LICENSEE's books and records. All sales of the Licensed Products shall be made on sequentially numbered invoices which shall contain sales related only to the Licensed Products; and contain a statement that it shall only be paid to LICENSEE and be recorded in separate ledger accounts or such other listings so as to easily trace the source of the reported sales.

(c)    All such books of account and records shall be kept available by LICENSEE for no less than three (3) years after the termination, expiration, or mutual release from this Agreement, or, in the event of a dispute between the parties hereto, until three (3) years after that dispute is resolved, whichever is later.

7.2    **Right to Examine LICENSEE's Books and Records:**

(a)    During the Licensed Term and for three (3) years thereafter, LICENSOR (and/or its appointed designee) shall have the unlimited right, at its own expense, on at least five (5) business days' notice and during regular business hours, to examine, photocopy, and make extracts from such books of account and other records, documents, tax returns, financial statements, and material (including, but not limited to, invoices, purchase orders, sales records, and reorders) relating to the business of LICENSEE, with respect to LICENSEE's use of the Property, which shall be maintained and kept by LICENSEE during the period specified herein, and which LICENSEE shall make available to LICENSOR in the country in which LICENSEE customarily maintains the majority of such materials.

(b)    If any examination or audit discloses that the payments required to be made under this Agreement exceeded the payments actually made by more than five percent (5%) for any Contract Year, LICENSEE shall pay the cost of such examination or audit in addition to any amount that such examination or audit discloses is owed to LICENSOR together with interest on the unreported amount at a rate equivalent to eighteen percent (18%) per annum or the maximum legal rate of interest. All payments due pursuant to this paragraph must be made within fifteen (15) days after LICENSEE receives notice thereof. In the event that the audit discloses that the payments required to be made under this Agreement exceeded the payments actually made by

- 23 -

more than nine percent (9%) in any Contract Year throughout the Licensed Term, then such event shall be deemed an incurable breach of this Agreement.

## ARTICLE VIII – LICENSEE COVENANTS, REPRESENTATIONS, INSURANCE, INDEMNIFICATION, CONFIDENTIALITY AND SECURITY

8.1    **LICENSEE's Representations, Warranties and Covenants:** In addition to and without limiting any of LICENSEE's other representations, warranties or covenants set forth throughout this Agreement, in any way, LICENSEE hereby represents, warrants and covenants as follows:

(a)    LICENSEE currently has and will continue to have throughout the Licensed Term and Sell-Off Period, the full right, power and authority to enter into this Agreement and to assume and perform all of its duties and obligations hereunder. LICENSEE currently is not a party to, and LICENSEE shall not enter into during the Licensed Term and the Sell-Off Period, any contract, agreement or understanding with any individual, entity or entities which would in any way restrict or prevent LICENSEE from the performance of its duties under this Agreement. This Agreement has been duly and validly executed by LICENSEE and constitutes a valid and binding agreement of LICENSEE, enforceable against LICENSEE in accordance with its terms.

(b)    LICENSOR, in entering into this Agreement, is relying entirely upon the skills, reputation and personnel of LICENSEE, including its officers, directors and managers. LICENSEE acknowledges that this Agreement and the rights granted herein are personal to LICENSEE and, without the prior written consent of LICENSOR, which shall not be unreasonably withheld, may not be assigned, sublicensed, pledged, encumbered or otherwise affected, nor may any of LICENSEE's duties be delegated. Any attempted assignment, sublicense, transfer or encumbrance of this Agreement, or any part hereof, by LICENSEE without LICENSOR's prior written consent shall be void and shall constitute an incurable breach of this Agreement. The term "transfer" shall include (i) any merger or consolidation involving LICENSEE in which LICENSEE is not the surviving entity, (ii) any sale or transfer of all or substantially all of LICENSEE's assets, (iii) any transfer of LICENSEE's rights, obligations or both under this Agreement to any affiliate, division, business segment or other person or entity, and (iv) any acquisition or series of acquisitions by any third-party entity or entities whereby the cumulative total of forty-nine percent (49%) or more of the voting stock or beneficial interest of LICENSEE is offered for purchase by or transferred to such party or parties, including without limitation, any public offering or series of public offerings.

(c)    Neither the execution and delivery of this Agreement nor the performance of LICENSEE's obligations hereunder will (i) violate any provision of the certificate of incorporation or by-laws (or other governmental instrument) of LICENSEE, (ii) violate, be in conflict with, or constitute a default (or an event which with notice or lapse of time or both, would constitute a default) under any agreement or commitment to which LICENSEE is party or (iii) violate in any respect a rule of any court or other governmental body applicable to LICENSEE. (d) LICENSEE is duly organized, validly existing and in good standing under the laws of the state of its incorporation or creation and has all requisite power to own, lease and operate its properties and to carry on its business as now being contemplated by this Agreement. LICENSEE is duly qualified and in good standing to do business in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it or to be conducted by it pursuant to this Agreement makes such qualification necessary.

- 24 -

McDonald's-CRM

(e)    There has not been filed any petition or application, or any proceedings commenced by or against LICENSEE, or with respect to any assets of LICENSEE, under the Bankruptcy laws of any state or country or any other law, domestic or foreign relating to bankruptcy, reorganization, compromise, arrangement, insolvency, or readjustment of debt or creditors' rights, and LICENSEE has not made any general assignment for the benefit of creditors, nor has a receiver been appointed.

(f)    LICENSEE acknowledges that LICENSOR reserves the right to freely assign this Agreement and said rights and obligations shall inure to the benefit of and be binding upon its successors and assignees.

8.2    **Confidentiality of Information:**

(a)    LICENSEE shall regard and preserve as confidential all information related to the business of AGENT, LICENSOR and their customers, employees or franchisees which may be obtained by LICENSEE from any source as a result of this Agreement, or otherwise, and information respecting designs, advertising, promotions, marketing plans and other information which LICENSOR or AGENT may provide to LICENSEE to assist it in the development and sale of the Licensed Products. LICENSEE shall confine and limit the use of all such information and ideas exclusively to the development and sale of the Licensed Products, and shall not use or adopt such information and ideas in connection with any product which is not a Licensed Product. Upon expiration or termination of this Agreement for any reason, LICENSEE shall forthwith return to LICENSOR or AGENT, as applicable, any such information.

(b)    Without limiting the generality of the immediately preceding paragraph:

(i)    LICENSEE shall not, without first obtaining LICENSOR's written consent, at any time, whether during the Licensed Term or thereafter, disclose to any person, firm, agency, authority, or other enterprise, or in anyway use for its benefit any information relating to the customer lists, pricing, methods, processes, apparatus, programs, practices, employees, or other materials conceived, designed, created, developed, or assembled for or by AGENT, LICENSOR, its licensees or its agents;

(ii) LICENSEE shall instruct its employees having access to such information not to copy, duplicate, or otherwise use, or disclose such information to third parties, except as otherwise contemplated by this Agreement. LICENSEE shall effect reasonable security precautions to safeguard such information from theft or from access by persons other than its employees using it in accordance with this Agreement; and

(iii) LICENSEE's confidentiality obligations hereunder shall survive the expiration or termination of this Agreement.

8.3    **Insurance Requirement:**

(a)    Simultaneously with the execution of this Agreement, LICENSEE shall promptly obtain and maintain in full force and effect at all times during the Licensed Term and for at least two (2) years thereafter, at its own cost and expense, product liability insurance for the Licensed Products, in the amount of Five Million Dollars ($5,000,000.00) of primary and umbrella coverage from one or more insurance companies, each with a Best's rating of "A" or better, and qualified to transact business in the Licensed Territory. The deductible for such insurance shall not

- 25 -

exceed One Hundred Thousand Dollars ($100,000). Such product liability insurance shall be in form and substance acceptable to LICENSOR and shall cover any claims, demands, causes of action and damages, including reasonable attorneys' fees arising from any alleged defects in the Licensed Products.

(b)    All of said insurance shall:

(i)    provide for coverage resulting from claims reported after the policy period;

(ii)    name all of the LICENSOR Indemnified Parties (as defined below) as additional insureds;

(iii) provide for at least thirty (30) days prior written notice to LICENSOR and AGENT of any cancellation, modification, surrender, or any other action that would affect LICENSOR's or AGENT's status or benefits thereunder; and

(iv) shall include coverage for claims brought in the United States in addition to the Licensed Territory.

(c)    LICENSEE shall promptly furnish or cause to be furnished to AGENT evidence, in form and substance satisfactory to AGENT, of the maintenance and renewal of the insurance required herein, including, but not limited to, copies of policies with applicable riders and endorsements, Certificates of Insurance, and Continuing Certificates of Insurance.

8.4    **Indemnification and Exculpatory Clause:**

(a)    LICENSEE Indemnifies LICENSOR.

(i)    "LICENSOR Indemnified Parties" means LICENSOR, its successors and assigns; its franchisees, subsidiaries, affiliates, distributors and designated purchasers; AGENT; and the directors, officers, agents, and employees of each and all of the above. LICENSOR Indemnified Parties are third-party beneficiaries under this Agreement.

(ii)    LICENSEE will at all times indemnify and hold harmless LICENSOR Indemnified Parties from all Losses (as defined below) incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted), which arises out of or is based upon any of the following acts or circumstances, regardless of any allegations of negligence or willful misconduct by a LICENSOR Indemnified Party and regardless of whether LICENSOR has reviewed or approved any Product:

(A)    Defects or alleged defects in the Products including, without limitation, latent defects;

(B)    The infringement, alleged infringement, or any other violation or alleged violation of any patent, trademark, copyright, right of privacy, right of publicity, or trade secret or rights or other proprietary rights owned or controlled by third parties by reason of the manufacture, importation, use, advertising, offer for sale, sale or distribution of the Products;

McDonald's-CRM

(C)    The violation or asserted violation of any federal, state or local law, regulation, ruling, standard or directive or of any industry standard with respect to the Products or to activities related thereto;

(D)    LICENSEE's violation or breach of any warranty, representation, agreement or obligation hereunder;

(E)    Libel, slander or other form of defamation as it may relate to this Agreement or LICENSEE's relationship with AGENT, LICENSOR or its affiliates; or

(F)    Any negligence of LICENSEE.

(iii)    LICENSOR agrees to give LICENSEE notice of any such action, suit, proceeding, claim, demand, inquiry or investigation or settlement thereof. At the expense and risk of LICENSEE, LICENSOR Indemnified Parties may elect (but under no circumstance are obligated) to undertake the defense or settlement of any such action, suit, proceeding, claim, demand, inquiry or investigation. Such an undertaking by LICENSOR Indemnified Parties will, in no manner or form, diminish LICENSEE's obligation to indemnify LICENSOR Indemnified Parties and to hold them harmless.

(iv)    In order to protect persons or property, or its reputation and goodwill, or the reputation and goodwill of others, LICENSOR Indemnified Parties may, at any time and without notice, and as they, in their judgment deem appropriate, order or consent to a recall, make refunds or settlements, give notice to consumers, or provide remedies with respect to the Product if, in LICENSOR's sole judgment, there are reasonable grounds to believe that:

(A)    any of the acts or circumstances enumerated in subsection (a)(ii) above have occurred; or

(B)    any one or more of the Products, for any reason, may constitute a danger or hazard to any person or any property.

(vi)    All Losses incurred under this section will be chargeable to and paid by LICENSEE pursuant to its obligations of indemnity under this paragraph, regardless of any actions, activity or defense undertaken by LICENSOR Indemnified Parties or LICENSEE or the subsequent success or failure of such actions, activity ordefense. As used in this Article VIII, the word "Losses" includes, without limitation, alllosses, damages, charges, costs, expenses, lost profits, attorney's fees, court costs, settlement amounts, judgments, compensation for damage to AGENT's or LICENSOR's reputation and goodwill, packaging costs, storage costs, shipping costs, costs of financing, costs of advertising materials and media time/space (to the extent not utilized) and costs to replace same, any and all expenses of recall, refunds, compensation, public notices and other amounts incurred in connection with the matters described therein.

(b)    LICENSOR assumes no liability, whatsoever, for the acts or omissions of any of those with whom LICENSEE may contract or engage for the manufacture, distribution or sale of Products. LICENSEE shall indemnify and hold LICENSOR Indemnified Parties harmless from all Losses which LICENSOR Indemnified Parties may suffer, arising out of any acts or omissions of these third parties.

(c)    LICENSOR will throughout the Term of this Agreement indemnify and hold LICENSEE harmless from all actions, suits, proceedings, losses, damages, charges, claims,

- 27 -

McDonald's-CRM

demands, expenses and costs (including attorney's fees, court costs and other costs of litigation or administrative proceeding) in any way arising out of LICENSEE's use of the Marks as authorized by this Agreement; provided, however, that LICENSOR shall have received prompt, written notice of and will have had the option of undertaking and conducting the defense of any such action, suit, proceeding, claim or demand.

8.5    **Third-Party Infringement:** In the event LICENSEE learns of any use of the Property or confusingly similar trademarks by any third party on or in connection with the Licensed Products or other products that LICENSEE has reason to believe constitutes an infringement of the Property, LICENSEE shall promptly notify LICENSOR and AGENT in writing of such use and all the known details thereof. LICENSEE shall not, without LICENSOR's written consent, bring or cause to be brought any criminal prosecution, lawsuit or administrative action for infringement, interference with or violation of any rights to the Property. LICENSOR shall take whatever action, if any, it deems appropriate in its sole discretion, to stop said infringement and LICENSEE agrees to cooperate with LICENSOR, and if necessary to be named as a co-complainant in any action against any infringer of the Property.

## ARTICLE IX - EXPIRATION, TERMINATION, AND CONSEQUENCES OF TERMINATION

9.1    **Cessation of Agreement:** Subject to the continuing obligations arising from a breach hereof and those terms that survive cessation of this Agreement, this Agreement and all rights relevant thereto shall cease upon the earlier of termination, for whatever reason, or expiration and revert to LICENSOR.

9.2    **Termination Procedure:**

(a)    In the event LICENSEE breaches any of the terms or conditions or any of the representations and warranties contained in this Agreement, LICENSOR shall have the right, by giving notice to the LICENSEE, to terminate this Agreement in its entirety, or to delete from this Agreement any elements of the Property, any Licensed Products or product categories, any Licensed Territory or Territories, or any Channel(s) of Distribution. If the breach is of a type that is not curable, which shall include without limitation all breaches that are identified in this Agreement as incurable, then termination shall be effective immediately, upon the date of receipt by LICENSEE of such notice of termination. All other breaches of the agreement shall be deemed defaults, for which LICENSEE shall have thirty (30) days from the date of receipt by LICENSEE of such notice of default to completely remedy same, provided however that in the event that a default occurs with respect to any payment or the submission of any report due under the terms of this Agreement, LICENSEE shall have five (5) days from receipt of notice of such default within which to remedy the same. Notwithstanding any provision to the contrary, if LICENSEE receives two (2) notices of default throughout the Licensed Term, then any future default may, at the sole option and in the sole discretion of LICENSOR, be deemed an incurable breach.

(b)    Upon the occurrence of any of the following, LICENSEE shall be deemed to have incurably breached the Agreement:

(i)    the filing of a petition by or against LICENSEE under the United States Bankruptcy Act, as amended, or under the insolvency laws of any state, or in the event that LICENSEE or a third party commences a proceeding or files a petition of similar import under

McDonald's-CRM

another applicable bankruptcy or insolvency law in which LICENSEE is the subject of such action which is not dismissed within thirty (30) days;

(ii)    if LICENSEE makes an assignment for the benefit of any creditors;

(iii)    if LICENSEE defaults on any obligation which is secured by a security interest in whole or in part in the Licensed Products or equipment relating to the manufacture thereof; or

(iv) if a receiver is appointed for LICENSEE for a substantial part of its business or assets.

(c)    LICENSOR shall be deemed to be in default if: (i) due to any material change in LICENSEE's financial position, LICENSEE is not permitted or unable to operate its business in the usual manner or is not permitted or is unable to provide LICENSOR, immediately upon request, with assurances satisfactory to LICENSOR that LICENSEE will so operate its business and is financially able to fulfill the requirements of this Agreement; or (ii) for any other reason, LICENSEE is unable to pay its debts to third parties as such debts become due.

9.3    **Continued Sales After Expiration:**

(a)    Subject to the conditions set forth herein, and upon expiration of this Agreement for any reason other than LICENSOR's termination hereof, LICENSEE shall have the time period, if any, set forth in this Agreement as the Sell-Off Period in which, on a nonexclusive basis, LICENSEE may dispose of its then existing inventory of Licensed Products by selling and distributing such Licensed Products to LICENSEE's Authorized Channels of Distribution. LICENSEE shall have no right, however, to dispose of or otherwise deal in any Licensed Products or such other tangible items bearing elements of the Property that were made of raw materials, piece goods, finished goods, or the like, purchased after the date that is four (4) months prior to the expiration of this Agreement without the prior written consent of LICENSOR. Moreover, LICENSEE shall have no right to sell or distribute the Licensed Products to any entity other than the Authorized Channels of Distribution.

(b)    Prior to selling any Licensed Products at any time subsequent to the expiration of this Agreement, LICENSEE shall deliver to LICENSOR a complete and detailed statement setting forth the number and description of its then remaining inventory, raw materials, work in progress, advertising, copies of orders LICENSEE intends to fill, and the like, no later than one hundred twenty (120) days prior to the expiration date of this Agreement. LICENSEE shall give LICENSOR at least ten (10) days prior written notice of the time and date it intends to compile the data for preparation of the statement, and shall permit LICENSOR to be present at that time and at all times thereafter during the Sell-Off Period and to have complete access to verify the accuracy of the statement. At any time when LICENSOR is present to verify such information, LICENSEE shall make available its books and records for inspection by LICENSOR. Unless LICENSOR makes a written objection to any part of said statement or requests verification as to any part of said statement within fourteen (14) days after LICENSOR's receipt thereof, said statement shall be deemed accurate and LICENSEE may dispose of the remaining completed Licensed Products within said Sell-Off Period by selling and distributing such Licensed Products to LICENSEE's Authorized Channels of Distribution. LICENSEE shall have no right to dispose of or otherwise deal in any Licensed Products or use tangible items bearing elements of the Property during the Sell-Off Period if it refuses to allow LICENSOR to exercise its rights hereunder or if it fails to resolve the objections to the satisfaction of LICENSOR.

- 29 -

McDonald's-CRM

(c)     No later than fifteen (15) days following the close of each month during the Sell-Off Period, LICENSEE shall remit to LICENSOR all required Earned Royalties on all such Net Sales, along with the appropriate report in accordance with the provisions of this Agreement. In the event LICENSEE fails to make any such payment to LICENSOR or AGENT, as applicable, on a timely basis, LICENSEE shall forfeit its right to sell off its remaining inventory. LICENSEE acknowledges and agrees that any GMR payments made by LICENSEE during any Contract Year throughout the Licensed Term, shall not, in any way, apply against LICENSEE's sales of Licensed Products during the Sell-Off Period. Within fifteen (15) days after expiration of the last thirty (30) day period of the Sell-Off Period or after the actual liquidation of all remaining Licensed Products, whichever is earlier, LICENSEE shall remit the remaining Earned Royalties to LICENSOR or AGENT, as applicable, and shall, at the same time, remove and send to LICENSOR, at LICENSEE's sole cost and expense, all Licensed Products and Materials from the then remaining inventory, and shall cease to act in any way which may lead another to believe that LICENSEE still has the right to use of the Property.

(d)     Notwithstanding the foregoing, upon expiration or termination of this Agreement for any reason, LICENSOR shall have the right and option, to be exercised in writing and mailed or delivered no later than fifteen (15) business days after such event, to purchase any or all remaining Licensed Products and Materials at LICENSEE's manufactured cost, on terms acceptable to LICENSOR.

9.4    **Changes in Law:** It is understood and agreed that LICENSOR has the right to terminate this Agreement immediately, upon written notice to LICENSEE, in the event that LICENSOR has been advised in writing by counsel that LICENSOR's use of the Property or Licensed Products is in any way threatened or endangered as the result of any change in any law, rule or regulation, including the interpretation of any of the foregoing by any governmental authority charged with the administration therewith.

## ARTICLE X - MISCELLANEOUS

10.1    **Limitation of Relationship:** Nothing contained herein shall be construed to place either party in the relationship of legal representative, partner, joint venturer, principal, or agent of the other, and LICENSEE shall have no authority to obligate or bind LICENSOR.

10.2    **Notices:** Any notices to be given under this Agreement shall be in writing and shall for all purposes be deemed to be fully given by a party when sent by certified mail, postage prepaid and return receipt requested, reputable overnight carrier or by fax, if the fax transmission is confirmed, to the other party at the respective address(es) set forth in Paragraph A17. The date of mailing or faxing shall be deemed to be the date on which such notice is given. Either party may change its address for the purposes of this Agreement by giving the other party written notice of its new address.

10.3    **Choice of Law:** THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS WITHOUT REGARD TO THE CONFLICTS OF LAWS PROVISIONS. LICENSEE SUBMITS TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS (EASTERN DIVISION) AND DUPAGE COUNTY STATE COURTS OF ILLINOIS IN CONNECTION WITH ALL SUITS, ACTIONS, PROCEEDINGS OR OTHER DISPUTES RELATING TO THIS AGREEMENT,

- 30 -

McDonald's-CRM

THE PARTIES' BUSINESS RELATIONSHIP, AND THE LICENSED PRODUCTS. LICENSEE AGREES TO (1) SUBMIT TO THE PERSONAL JURISDICTION AND VENUE OF THE ILLINOIS COURTS; (2) WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTIONS TO THE JURISDICTION AND VENUE OF THE ILLINOIS COURTS; AND (3) WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY SUCH ACTION. LICENSEE FURTHER AGREES THAT PROCESS MAY BE SERVED ON IT BY MAILING THE SAME TO IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, WITH THE SAME EFFECT AS THOUGH SERVED UPON IT PERSONALLY. FOR ANY THIRDPARTY CLAIM FILED AGAINST LICENSOR IN A JURISDICTION OUTSIDE THE UNITED STATES THAT TRIGGERS LICENSEE'S INDEMNIFICATION OBLIGATIONS HEREUNDER, LICENSEE CONSENTS TO JURISDICTION IN THAT FOREIGN COUNTRY FOR PURPOSES OF RESOLVING THE THIRD-PARTY CLAIM.

10.4    **Specific Performance to Obtain Cooperation:** Without prejudice to any other right and/or remedy that LICENSOR may have under this Agreement or the law, if, after notice to LICENSEE, LICENSEE fails to take any action which LICENSEE is obligated to take hereunder, including, without limitation, providing any information and submitting required notices, reports, products, or uses of the Property, then LICENSOR shall have the right and option, but not the obligation, to bring an action for specific performance to compel such action, and LICENSEE shall pay any and all costs and expenses and reasonable attorneys' fees and disbursements incurred by LICENSOR relevant thereto.

10.5    **Uniqueness of Licensed Marks, Equitable and Legal Relief:** LICENSEE recognizes that the Property possess a special, unique, and extraordinary character which makes difficult the assessment of monetary damages which LICENSOR might sustain by an unauthorized use. LICENSEE recognizes and agrees that irreparable injury would be caused by LICENSEE's unauthorized use, and that injunctive and other relief, in law and equity, would be appropriate in the event of a breach of this Agreement by LICENSEE. In the event that any action or proceeding is brought by LICENSOR against LICENSEE arising out of, or by reason of, the breach of this Agreement, including third-party claims and cross-claims, LICENSEE shall pay any and all costs, expenses, and reasonable attorneys' fees and disbursements incurred by LICENSOR, including, but not limited to, appeals.

10.6    **LICENSOR's Right to Appoint Representatives:** LICENSOR and AGENT, jointly, shall have the right at any time to appoint and designate in writing an authorized representative or representatives who shall be empowered to act on behalf of LICENSOR or AGENT with regard to any matter pertaining to this Agreement, including, without limitation, the right to collect all payments due hereunder and the right to conduct the approval procedures with respect to all proposed products and Materials.

10.7    **No Waiver of Rights:** The failure of a party to insist upon strict adherence to any provision of this Agreement on any occasion shall not be considered or deemed to be a waiver nor considered or deemed to deprive that party of the right thereafter to insist upon strict adherence to that provision or any other provision of this Agreement. No custom or practice of the parties hereto at variance with the terms hereof shall constitute a waiver of that party's right to demand exact compliance with any of the terms herein at any time. Any waiver must be in writing, signed by LICENSOR, AGENT and LICENSEE.

McDonald's-CRM

10.8    **Complete Agreement; No Oral Modification; Severability; Surviving**

**Provisions:**

(a)    This Agreement is a complete statement of all agreements among the parties with respect to its subject matter. Any amendment, modification, alteration, change or waiver must be in writing. LICENSEE acknowledges that LICENSOR and AGENT have made no warranties or representations except those expressly stated herein, if any.

(b)    If any provision of this Agreement is for any reason declared to be invalid or unenforceable, the validity of the remaining provisions shall not be affected thereby.

(c)    The recitals are hereby incorporated in this Agreement. Headings are used solely for convenience and should not be given any weight in the interpretation of this Agreement. All Exhibits, including the Code of Conduct, are hereby incorporated and merged into this Agreement and made a part hereof.

(d)    Any provision of this Agreement which by its plain import is intended to extend beyond expiration or termination, as the case may be, shall survive expiration or termination of the Licensed Term.

(e)    This Agreement shall be construed without regard to any presumption or any other rule requiring construction against the party causing this Agreement or any part thereof to be drafted.

(f)    The respective rights and remedies of the parties hereto, whether herein specified or otherwise, shall be cumulative, and the exercise of one or more of them shall not preclude the exercise of any or all other rights and remedies each such party has hereunder or by law.

(g)    LICENSOR and AGENT have executed one or more agreements for the purpose of setting forth the rights and obligations of each of them with respect to the business relationship between LICENSOR and AGENT. This Agreement in no way modifies or supersedes such other agreements.

McDonald's-CRM

IN WITNESS WHEREOF the parties have first caused this License Agreement to be executed as of the day and year first above written.

**CHINA RETAIL MANAGEMENT LIMITED, a related company of CORNERSTONE OVERSEAS INVESTMENT LIMITED**

By: _____

Name: ___HSIEH Cheng, Jeff_____

Title: ___Chief Executive Officer_____

Date: ___2 November 2005_____

**DIC ENTERTAINMENT CORPORATION**

By: _____

Name: ___Joshua A. Meyer_____

Title: ___SENIOR VICE PRESIDENT BUSINESS & LEGAL AFFAIRS___

Date: ___4|28|06_____

**McDONALD'S CORPORATION**

By: _____

Name: ___JEFFERY N. CRAC_____

Title: ___CORP VICE PRESIDENT_____

Date: ___6/15/06_____

### Exhibit A

### THIRD-PARTY MANUFACTURING AGREEMENT

THIS AGREEMENT made this ____ day of _____, by and between _____, having an office at _____ (hereinafter referred to as the "Company"), and _____ having an office at _____ (hereinafter referred to as the "Manufacturer").

WITNESSETH:

WHEREAS, Manufacturer is engaged in the manufacture of apparel products and other items, more specifically set forth in Exhibit A;

WHEREAS, Company is an authorized licensee of McDonald's Corporation, the owner of the McKids Trademarks;

WHEREAS, Company wishes to contract with Manufacturer for the manufacture of certain products, as more specifically set forth in Exhibit A, (the "Products") which will bear one or more of the McKids Trademarks, all related logos, emblems or symbols, and all combinations, forms and derivatives thereof as are from time to time used by Company or any of its affiliates (the "Trademarks"); and

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereby agree as follows:

1.     THE PRODUCTS.  Company has created certain designs and patterns from which Manufacturer will create three-dimensional samples. Company shall advise Manufacturer if the samples meet Company's quality requirements within fifteen (15) days of receipt.  Manufacturer shall make any modifications to the samples as required by Company.  Samples accepted by Company shall be designated as prototypes for the purposes of this Agreement.  Company has also created Packaging (as herein defined) utilizing the Trademarks to be used in conjunction with the Products.  Packaging shall include, without limitation, hang tags, labels and other packaging.

2.     TERM.  The term of this Agreement shall commence as of the date hereof and expire on the last day of the twelfth (12th) month after the commencement date hereof; however, either party shall have the right to terminate this Agreement, upon thirty (30) days written notice to the other of its intention to terminate the Agreement. Upon such termination, paragraph 17 shall apply.

3.     MANUFACTURE.

(a)     Manufacturer shall only manufacture the specific number of Products as requested by Company and at no time shall manufacture excess goods or

overruns  Manufacturer shall not sell any Products bearing the Trademarks to any third parties without the express written consent of Company or McDonald's Corporation..

(b)     Manufacturer hereby represents and warrants that all products manufactured by it and all labeling and packaging utilized on or in connection with the Products shall strictly conform in quality and specifications to the prototypes as defined in Paragraph 1 above.

(c)     All Products and Packaging manufactured by Manufacturer shall be delivered to locations specified by Company or directly to Company, whichever Company may direct.

(d)     At least fifteen (15) days prior to the start of each production run, Manufacturer shall provide Company with a report, listing the quantity produced for each style and the factories utilized in connection with the manufacture of such Products, along with a listing of the specific labels, tags and packaging and the names of the sources thereof, true samples of which will be provided to Company within 5 days after Company's request.

(e)     Attached hereto as Exhibit B is the "McDONALD'S CODE OF CONDUCT FOR SUPPLIERS" (the "Code") which applies to any entity manufacturing, selling or distributing merchandise under the McKids Trademarks. As a condition to manufacturing Products hereunder, Manufacturer shall comply with the terms of the Code and evidence such compliance by, (1) upon execution of this Agreement, executing the Code in the form attached and returning such document to Company, and (2) publicly displaying the Code, in a form as provided by Company from time to time, in a clearly visible location in Manufacturer's facility at all times while this Agreement is in effect.

(f)     In order to ensure compliance with the Code, Company has developed a program of monitoring its manufacturers and such manufacturers' Subcontractor(s) (hereinafter the "Supplier Monitoring Program"). As a condition to manufacturing Product hereunder, Manufacturer hereby agrees that it shall cooperate fully with the Supplier Monitoring Program, which cooperation includes but is not limited to Company's inspections in accordance with Paragraph 4, below.

(g)     For purposes of this Agreement, a "Subcontractor" is an entity or an individual which or whom Manufacturer either hires or pays to perform certain of the manufacturing tasks which Manufacturer could otherwise perform itself at its own facility or through its own employees.  Manufacturer may only use a Subcontractor with the express written consent of Company. If Manufacturer intends to use a Subcontractor, then at least fifteen (15) days prior to any production of Products by such Subcontractor, Manufacturer must provide Company with information concerning the name and address of such Subcontractor, its shareholders, owners, directors and officers, along with any other information that Company or McDonald's Corporation may request in their sole respective discretion. Each Subcontractor must be approved by the Company in writing prior to any use of same. Any Subcontractor not approved in writing by Company shall not be utilized by Manufacturer.  Prior to the approval thereof by Company, Manufacturer shall obtain and provide to Company the signature of an

authorized representative from each Subcontractor (if any) used in the production of Products for Company on a Subcontractor Manufacturing Agreement which shall contain all of the provisions set forth in this Agreement.

(h)    In the event Manufacturer has knowledge of, has reason to believe, or should have reason to know that any Subcontractor is in breach of the Subcontractor Manufacturing Agreement, Manufacturer shall immediately notify Company and McDonald's Corporation and Manufacturer shall immediately cease using such Subcontractor, unless Company and McDonald's Corporation agree to permit work-in-progress to be completed. If Manufacturer fails to cease using the breaching Subcontractor, Company shall have the right to terminate this Manufacturing Agreement immediately, without prejudice to any other rights and remedies that Company and/or McDonald's Corporation may have against Manufacturer and such Subcontractor. Manufacturer acknowledges that it shall remain primarily liable and completely obligated under all of the provisions of this Agreement for all breaches with respect of any subcontracting arrangement.

(i)    Manufacturer hereby represents and warrants that it has in effect a program for monitoring its Subcontractors and any other designated contract facilities which shall manufacture Products bearing the McKids Trademarks or any piece goods thereof which program is sufficient to ensure their compliance with the Code and all applicable state, local and foreign laws and regulations pertaining to wages, overtime compensation, benefits, hours, hiring and employment, workplace conditions and safety, the environment, collective bargaining, and freedom of association. Manufacturer further represents and warrants that all Products shall be manufactured without the use of any child (persons under the minimum age of employment in the country of manufacture, or younger than the age for completing compulsory education, whichever age is higher) and without the use of any prisoner, indentured, exploited, bonded, forced or slave labor.

(j)    Manufacturer shall ensure that all merchandise manufactured hereunder shall be manufactured in compliance with the Code and with all applicable U.S. federal, state and local laws which pertain to the manufacture of clothing, apparel, and other merchandise, including the U.S. Flammable Fabrics Act, as amended, and regulations thereunder and Manufacturer guarantees, that with regard to all products, fabrics or related materials used in the manufacture of the Products, for which flammability standards have been issued, amended or continued in effect under the U.S. Flammable Fabrics Act, as amended, reasonable and representative tests, as prescribed by the U.S. Consumer Product Safety Commission, have been performed which show that the Products at the time of their shipment or delivery conform to the above-referenced flammability standards as are applicable.

(k)    In addition to strict compliance with the Code, if Manufacturer shall manufacture or cause to be manufactured any Products in the United States, then such Products shall be manufactured in compliance with all applicable requirements of Sections 6, 7, and 12 of the U.S. Fair Labor Standards Act, as amended, and all regulations and orders of the United States Department of Labor under Section 14 thereof, and applicable state and local laws pertaining to child labor, minimum wage and overtime compensation, and, if the Products are manufactured outside the United States, in compliance with all applicable laws, including but not limited to, wage, overtime

compensation, benefits, hour, hiring and employment, workplace conditions and safety, environmental, collective bargaining, freedom of association laws of the country of manufacture and without the use of child (persons under the minimum age of employment in the country of manufacture, or younger than the age for completing compulsory education, whichever age is higher), prison, indentured, exploited bonded, forced or slave labor.

(l)    Manufacturer shall not utilize or permit any Subcontractors to utilize in the manufacture or treatment of any of the Products manufactured hereunder, any Azo dyes that can be split into any of the following amines:

| | |
|---|---|
| 4-Aminobiphenlyl | 92-67-1 |
| Benzidine | 92-87-5 |
| 4-Chloro-o-toluidine | 95-69-2 |
| 2-Naphthylamin | 91-59-8 |
| o-Aminoazotoluol | 97-56-3 |
| 2-amino-4-nitrotoluol | 99-55-8 |
| p-Chloroaniline | 106-47-8 |
| 2, 4-Diaminoanisole | 615-05-4 |
| 4, 4-Diaminodiphenylmethane | 101-77-9 |
| 3, 3-Dichlorbenzadine | 91-94-1 |
| Aminoanabenzane | |
| 3, 3-Dimethoxybenzidine | 119-90-4 |
| 3, 3-Dimethylbenzadine | 119-93-7 |
| 3, 3-Dimethyl- | 838-88-0 |
| 4, 4 Diaminodiphenylmethane | |
| p-Kresidin | 120-71-8 |
| 4, 4Methaylen-bis- | |
| (2-chloranil) | 101-14-4 |
| 4, 4oxydianiline | 101-80-4 |
| 4, 4Thiodianiline | 139-65-1 |
| o-Toluidine | 95-53-4 |
| 2, 4-Toluylenediamine | 95-80-7 |
| 2, 4, 5-Trimethylaniline | 137-17-7 |
| o-Anisidine | |

(m)    Manufacturer's use, any Subcontractors' use or any other person's or entity's use of the following chemicals in connection with the manufacture or treatment or any of the Products manufactured hereunder, shall be in accordance with the following standards or such other standards that Company may designate from time to time:

(i)    Formaldehyde:  Must be less than 300 p.p.m. when tested by the Acetylacetone method in accordance with Japanese law 112;

(ii)    Pentachlorophenol (Pesticides):  Must be less than 5 p.p.m.; and

(iii)   Nickel: In the event any metal parts of a Product or other merchandise coming into contact with the skin, contain nickel in excess of 0.5 micrograms per square centimeter/week, Company must be so notified and special warning labels need to be attached to the garment.

4.   INSPECTION.

(a)   Manufacturer shall arrange for and provide access to Company's and McDonald's Corporation representatives, including, but not limited to, any independent entity designated by Company's and/or McDonald's Corporation's legal representative, to:

(i)   Manufacturer's manufacturing facility, residential facilities (if any) and any manufacturing and/or residential facility operated by any Subcontractors;

(ii)   Manufacturer's books, records and documents evidencing Manufacturer's compliance with the Code and all applicable laws, rules and regulations, including, but not limited to, employee wages, employee timecards, withholding rates and deductions, worker's contracts and/or agreements, any company policies affecting employees, evidence of employee age, shipping documents, cutting reports and other documentation relating to the manufacture and shipment or the Products; and

(iii)   Manufacturer's books, records and documents relating to the use of chemicals and dyestuffs in the fabrics, trims, garments and other merchandise manufactured hereunder. For purposes of this Paragraph 4, such books, records and documents shall be maintained by Manufacturer in a secure and readily accessible location for a period of three (3) years from their creation.

(b)   The access provided by Manufacturer as set forth in Paragraph 4(a) above shall include the Company's and McDonald's Corporation's right to inspect, test, and take samples of the Products, whether finished or in process, at any time during the manufacturing process to ensure that the manufacture of the Products is in accordance with the terms and restrictions herein contained.

(c)   Company shall have the right to reject any Products or packaging not meeting the standards described in Paragraph 1 above. Manufacturer shall not have the right to inspect, test or otherwise distribute any rejected Products or packaging. All such products shall be destroyed according to methods and procedures provided by Company.

5.   SHIPPING LEGEND. All commercial invoices (bills of lading) which accompany all Products must include the following language (either preprinted or "stamped"):

"We hereby certify that the merchandise covered by this shipment was manufactured in compliance with the "McDONALD'S CORPORATION ETHICAL STANDARDS Code and: (1) if the merchandise was manufactured in the United States, it was manufactured in compliance with (a) sections 6, 7, and 12 of the Fair Labor Standards Act, as amended and all regulations and orders of the United States Department of Labor under section 14 thereof, and (b) state and local laws pertaining to child labor, minimum wage and overtime compensation; or (2) if the merchandise was manufactured outside the United States, was manufactured in compliance with the wage and other laws of the country of manufacture and without the use of child (persons under the minimum age of employment in the country of manufacture, or younger than the age for completing compulsory education, whichever age is higher), prison, indentured, exploited bonded, forced or slave labor. We further certify that we have in effect a program of monitoring our subcontractors and other designated contract facilities which manufacture McKids® brand merchandise for compliance with the foregoing. We also certify that the merchandise is in compliance with all laws governing the designation of country of origin and, if applicable, is being shipped under legally issued and valid export license or visa."

Any merchandise shipped that is not accompanied by a commercial invoice containing the required language will be subject to rejection and returned at Manufacturer's expense and Manufacturer may be charged for any and all costs that are incurred by Company due to such rejection, including, but not limited to, damages sustained as a result of Company's liability to customers, any resulting fines and penalties and attorney's fees for said rejected goods. Such rejected goods may not be sold or distributed by Manufacturer to any entity other than Company.

6.    OWNERSHIP AND USE OF TRADEMARKS.

(a)    Manufacturer shall not use the Trademarks in any manner whatsoever (including, without limitation, for advertising, promotion and publicity purposes) without obtaining the prior written approval of Company and McDonald's Corporation, which may be withheld in the sole discretion of both the Company and McDonald's Corporation. In any event, Manufacturer shall not at any time use, promote, advertise, display or otherwise commercialize the Products or any other material utilizing or reproducing the Trademarks in any manner. Manufacturer shall not make any reference in its business materials, advertising or in any of its business activities to the

fact that Manufacturer is being contracted by Company to manufacture merchandise under the McKids ® brand.

(b)     The Trademarks will appear on all of the Products and all packaging in the manner provided and approved by Company.

(c)     No other trademarks or notices shall appear on Products or packaging without Company's and McDonald's Corporation's prior written consent in each instance.

(d)     Manufacturer's use of the Trademarks shall inure to the benefit of McDonald's Corporation. Manufacturer shall take any and all steps required by Company or McDonald's Corporation and the law to protect and  perfect rights therein.

(e)     Manufacturer recognizes the great value of the goodwill associated with the Trademarks and the identification of the Products with the Trademarks and acknowledges that the Trademarks and all rights therein and goodwill pertaining thereto belong exclusively to McDonald's Corporation. Manufacturer further recognizes and acknowledges that a breach by Manufacturer of any of its covenants, agreements or other undertakings hereunder will cause Company and McDonald's Corporation irreparable damage, which cannot be adequately remedied in an action at law, and may, in addition thereto, constitute an infringement of McDonald's Corporation's rights in the Trademarks, thereby entitling Company and McDonald's Corporation to equitable remedies, costs and attorney's fees.

(f)     To the extent any rights in and to the Trademarks are deemed to accrue to Manufacturer, Manufacturer hereby assigns any and all such rights, at such time as they may be deemed to accrue, including the related goodwill, to McDonald's Corporation.

(g)     Manufacturer shall (i) never challenge the validity of McDonald's Corporation's ownership in and to the Trademarks or any application for registration thereof, or any trademark registration thereof and (ii) never contest the fact that Manufacturer's rights under this Agreement are solely those of a manufacturer and terminate upon expiration of this Agreement. Manufacturer shall,  at any time, whether during or after the term of the Agreement, execute any documents reasonably requested by McDonald's Corporation to confirm McDonald's Corporation's ownership rights. All rights in the Trademarks are reserved by McDonald's Corporation for its own use and benefit.

(h)     Without limiting the generality of any other provision of this Agreement, Manufacturer shall not (i) use the Trademarks, in whole or in part, as a corporate or trade name or (ii) join any name or names with the Trademarks so as to form a new trademark.  Manufacturer agrees not to register, or attempt to register, the Trademarks in its own name or any other name, anywhere in the world.

(i)     All provisions of this Paragraph 6 shall survive the expiration or termination of this Agreement.

7.    TRADEMARK PROTECTION.

(a)    In the event that Manufacturer learns of any infringement or imitation of the Trademarks or of any use by any person or entity of a trademark similar to the Trademarks, Manufacturer shall promptly notify Company and thereupon, Company shall so notify McDonald's Corporation. McDonald's Corporation shall take whatever action that it, in its sole discretion, deems appropriate for the protection of its rights in and to the Trademark and Manufacturer shall cooperate with McDonald's Corporation in all respects.

(b)    Manufacturer shall cooperate with McDonald's Corporation and/or Company in the execution, filing and prosecution of any trademark, copyright or design patent applications that McDonald's Corporation may desire to file. For that purpose, upon the written request of Company, or McDonald's Corporation. Manufacturer shall supply to Company or McDonald's Corporation, as the case may be, with such samples of Products as well as hang tags, labels and packaging as may be requested.

(c)    All provisions of this Paragraph 7 shall survive the expiration or termination of this Agreement.

8.    TRANSSHIPMENT.    Transshipment is the illegal practice of falsely documenting the country of origin of the raw materials used to manufacture products and the finished Products shipped to the United States in order to evade quota restraints on the country of actual production and the shipment of products under counterfeit export licenses or visas. Manufacturer acknowledges that transshipment in any form violates U.S. federal law, that Company, and McDonald's Corporation will review all documents received from Manufacturer to assure the veracity and the authenticity of the sources of Products and that, upon any indication of transshipment of the Products by Manufacturer, Company, and McDonald's Corporation each reserves the right to immediately terminate this Agreement, without prejudice to any rights and remedies that Company, and McDonald's Corporation may have against Manufacturer.

9.    SECONDS, THIRDS OR EXCESS GOODS.    Manufacturer shall not have the right to sell any Products or packaging regardless of whether such are determined to be seconds, thirds or are in excess of the amount of the Products requested by Company. All seconds, thirds or excess products, including trims, shall, at the Company's option, be purchased by Company at a reasonable price, in light of the quality of the Products but at no more than fifty percent (50%) of cost. Any seconds, thirds or excesses not purchased by Company shall be destroyed by Manufacturer. Company shall have the right to inspect any seconds, thirds or excess Products to ensure that they comply with the terms of this Agreement.

10.    STOLEN GOODS OR DAMAGED GOODS.    Manufacturer will provide Company with immediate notice of any stolen Products or damaged Products, including Products that were then in production. With regard to damaged Products, Manufacturer shall not have the right to sell any damaged Products. With regard to

stolen Products, Manufacturer shall cooperate with Company with respect to any action regarding the stolen Products.

11.    DESIGN OWNERSHIP.    Manufacturer and Company each acknowledge and agree that all rights, including without limitation, trademark, trade name, copyright, trade secret and design patent, in and to any intellectual property created by Manufacturer and/or Company in connection with the Products including, without limitation, designs, artwork, prints, patterns, package designs, labels, advertising or promotional materials or any other designs using or used on or affixed thereto, and to any package design, bearing the Trademarks shall, as between the parties hereto, be the property of McDonald's Corporation. All Products manufactured from designs submitted by Company to Manufacturer in accordance with the provisions of paragraph 1 herein, shall be manufactured and sold only to Company and Manufacturer shall not manufacture any styles which are identical or similar in any way to such products.

12.    CONFIDENTIALITY. During the term of this Agreement and thereafter, each party shall keep strictly secret and confidential any and all information acquired from the other party hereto or its designee and shall take all necessary precautions to prevent unauthorized disclosure of such information. Manufacturer acknowledges that during the term of this Agreement, it will receive from Company prints, designs, ideas, sketches, and other materials which Company, and McDonald's Corporation intend to use on or in connection with lines of merchandise which have not yet been put into the channels of distribution. The parties recognize that these materials are valuable property of McDonald's Corporation. Manufacturer acknowledges the need to preserve the confidentiality and secrecy of these materials and agrees to take all necessary steps to ensure that use by it or by its employees and/or agents will in all respects preserve such confidentiality and secrecy. Manufacturer shall take all reasonable precautions to protect the secrecy of the materials, samples, and designs prior to their commercial distribution or the showing of samples for sale, and Manufacturer shall not manufacture any merchandise employing or adapted from any of said designs submitted by Company. All provisions of this Paragraph 12 shall survive the expiration or termination of this Agreement.

13.    MANUFACTURER'S WARRANTIES / REPRESENTATIONS. Manufacturer warrants and represents that:

(a)    it has and will have throughout the term of this Agreement, the full power, authority and legal right to execute and deliver, and to perform fully and in accordance with all of the terms of this Agreement.

(b)    the entering into of this Agreement by Manufacturer does not violate any agreements, rights or obligations existing between Manufacturer and any other person, entity, or corporation.

(c)    it is not engaged in and will not engage in any activities which are in violation of any applicable domestic, foreign or international laws, rules or regulations, including without limitation laws, rules or regulations governing labor, the

environment, the manufacture and sale of goods, U.S. Customs laws or illegal transshipment. Manufacturer maintains a policy against engaging in any illegal activities and will not buy or sell products provided through the use of any unlawful or unethical practices.

(d)    it accurately states the country of origin on all products.

(e)    it does not and will not transship, and it will act to stop or prevent any known illegal transshipment activity.

(f)    it shall not utilize, nor permit any of its Subcontractors to utilize in the manufacture or treatment of any of the Products manufactured hereunder, any Azo dyes that can be split into any of the amines set forth in Paragraph 3(l), above.

(g)    the use by Manufacturer or by any of its Subcontractors of the chemicals set forth in Paragraph 3(m) above in connection with the manufacture or treatment of any of the Products manufactured hereunder, shall be in accordance with the standards set forth in this Agreement or such other standards as Company may designate from time to time.

14.    COMPANY'S    WARRANTIES    /    REPRESENTATIONS. Company warrants and represents that:

(a)    it has, and will have throughout the Term of this Agreement, the right to authorize use of the Trademark to Manufacturer in accordance with the terms and provisions of this Agreement; and

(b)    the entering of this Agreement by Company does not violate any agreements, rights or obligations existing between Company and any other person, entity, or corporation.

15.    INDEMNIFICATIONS AND INSURANCE.

(a)    Company hereby indemnifies Manufacturer and shall hold it harmless from any loss, liability, damage, cost or expense (including reasonable attorney's fees) arising out of any claims or suits which may be brought against Manufacturer by reason of the breach by Company of any warranties or representations as set forth in this Agreement, provided that Manufacturer gives prompt written notice and full cooperation and assistance to Company relative to any such claim or suit, and that Company and McDonald's Corporation, at their option and in their sole discretion, shall have the option to undertake and conduct the defense of any suit so brought. Manufacturer shall cooperate fully in all respects with Company in the conduct and defense of said suit and/or proceedings.

(b)    Manufacturer hereby indemnifies and shall defend and hold Company and McDonald's Corporation and their respective parents, subsidiaries, affiliates, officers, directors, shareholders, employees, licensees, sublicensees, retailers, representatives and agents harmless from any loss, liability, damage, cost or expense (including attorney's fees), arising out of (i) any breach of the terms herein contained;

(ii)any claims or suits by reason of any unauthorized use by Manufacturer in connection with the Products or the Trademarks covered by this Agreement; (iii) Manufacturer's noncompliance with any applicable federal, state, or local law or with any other applicable governmental units or agency's rules and regulations; and (iv) any alleged defects and/or inherent dangers in products or use thereof.

(c)    If available in the country in which Manufacturer operates its factory, Manufacturer agrees to obtain, at its own expense, product liability insurance providing adequate protection for Company and Manufacturer against any claims or suits in an amount of at least U.S. $5,000,000. Within thirty (30) days from the date hereof, Manufacturer undertakes to submit to Company a fully paid policy or Certificate of Insurance naming Company and McDonald's Corporation as additional insured parties and requiring that the insurer shall not terminate or materially modify such without written notice to Company of at least thirty (30) days.

16.    TERMINATION.

(a)    Company shall have the right to terminate this Agreement immediately upon written notice to Manufacturer (to be delivered in accordance with the provisions of Paragraph 18 below) if Manufacturer breaches any of its obligations under this Agreement;

(b)    Company shall have the right to terminate this Agreement immediately upon written notice to Manufacturer, if Manufacturer is unable to pay its debts when due, or makes any assignment for the benefit of creditors, or files any petition under the bankruptcy or insolvency laws of any jurisdiction, country or place, or has or suffers a receiver or trustee to be appointed for its business or property, or is adjudicated a bankrupt or an insolvent;

(c)    Without limiting the foregoing in any way, Company shall have the right to terminate this Agreement immediately upon written notice to Manufacturer if Manufacturer fails to make timely delivery of the Products;

(d)    Notwithstanding the foregoing provisions, Company shall have the right at any time throughout the Term, to terminate this Agreement, with or without cause, upon thirty (30) days notice to Manufacturer, provided however, that, upon written approval by Company, Manufacturer shall have the right to complete any work then in process;

(e)    Manufacturer hereby acknowledges and agrees that McDonald's Corporation shall have the right to terminate this Agreement on any grounds which would entitle Company to terminate this Agreement.

17.    RIGHTS AND OBLIGATIONS UPON EXPIRATION OF THIS AGREEMENT.

(a)    Upon and after the expiration or termination of this Agreement, Manufacturer agrees not to make reference in its advertising or its business materials to having been formerly associated with Company or the Trademarks.

(b)     Upon and after the expiration or termination of this Agreement, Manufacturer will refrain from further use of the Trademarks or any confusingly similar marks, logos, graphics or designs thereto, in connection with the manufacture of any products. Additionally, all originals and copies of all sketches, patterns, prototypes, samples or other materials relating to the products shall be immediately returned by Manufacturer to Company.

(c)     Upon such termination or expiration, Manufacturer shall immediately cause physical inventories to be taken of (i) Products on hand; (ii) Products in the process of manufacture; and (iii) all hang tags, labels, and packaging materials, which inventories shall be reduced to writing and a copy thereof shall be delivered to Company not later than fifteen (15) days from such termination or expiration. Written notice of the taking of each inventory shall be given Company at least forty-eight (48) hours prior thereto. Company shall have the right to be present at such physical inventory or to take its own inventory, and to exercise any rights it has available with respect to the examination of Manufacturer's books and records.

(d)     Manufacturer recognizes that any sale of the Products by Manufacturer to any person other than Company would cause irreparable damage to the prestige of Company and to the Trademarks, and to the goodwill pertaining thereto and Manufacturer consents to the grant of temporary, preliminary and permanent injunctive relief to restrain any such sale which may be instituted against Manufacturer by either Company or McDonald's Corporation.

18.     NOTICES. All notices which either party hereto is required or may desire to give shall be given by addressing the same to the address hereinafter in this paragraph, or at such other address as may be designated in writing by any party in a notice to the other given in the manner prescribed in this Paragraph. All such notices shall be sufficiently given when mailed by registered or certified mail or delivered by hand or by overnight courier. The address to which any such notices shall be given are the following:

To Manufacturer:

To Company:

with a copy to:         McDonald's Corporation
                        2915 Jorie Boulevard
                        Oak Brook, IL 60523
                        Attn: Malcolm W. Hicks, Esq.

19.     NO PARTNERSHIP. This Agreement does not constitute and shall not be construed as a partnership or joint venture between Company and Manufacturer. Neither party shall have any right to obligate or bind the other party in any manner whatsoever, and nothing herein contained shall give, or is intended to give, any rights of any kind to any third persons.

20.   NON-ASSIGNABILITY.  This Agreement shall bind and inure to the benefit of the Company and its successors and assigns.  This Agreement is personal to Manufacturer, and neither this Agreement nor any of the rights of Manufacturer hereunder shall be sold, transferred, subcontracted, assigned, pledged or otherwise affected by Manufacturer and no rights hereunder shall devolve by operation of law or otherwise upon any receiver, liquidator, trustee or other party.   Any attempted assignment, sublicense, transfer or encumbrance shall be void and shall constitute a breach of this Agreement.  The term "transfer" shall include any merger or consolidation involving Manufacturer or any of Manufacturer's affiliates (including, without limitation, any entity which controls, is controlled by or is under common control with Manufacturer), any sale or transfer of all or substantially all of Manufacturer's (or any of Manufacturer's affiliates) assets, any transfer of Manufacturer's rights, obligations or both under this Agreement to any affiliate, division, business segment or other entity, any public offering or series of public offerings, and any acquisition or series of acquisitions by any third-party entity whereby the cumulative total of twenty percent (20%) or more of the voting stock or beneficial interest of Manufacturer is offered for purchase by or transferred to such party.   Attached hereto is a listing all present owners and their respective interests.

21.   SEVERABILITY.   If any provision or any portion of any provision of this Agreement shall be construed to be illegal, invalid, or unenforceable, all other provisions shall be enforced to the extent legal, valid and enforceable.

22.   HEADINGS.  The headings of the Paragraphs of this Agreement are for convenience only and shall in no way limit or affect the terms or conditions of this Agreement.

23.   COUNTERPARTS.  This Agreement may be executed by two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

24.   CONSTRUCTION.   This Agreement shall be construed in accordance with the State of New York of the United States of America, without reference to principles of conflict of laws with the same force and effect as if fully executed and to be performed therein.

25.   JURISDICTION.   The parties hereby consent to the exclusive jurisdiction of the United States District Court for the Southern District of New York and of any of the other courts of the State of New York, located in the County of New York in any dispute arising under this Agreement and the parties agree further that service of process or notice in any such action, suit or proceeding shall be effective if in writing and delivered in person or sent as provided in Paragraph 18 hereof.  The parties waive a jury trial in the above actions.

26.   WAIVER, MODIFICATION, ETC.  No waiver, modification or cancellation of any term or condition of this Agreement shall be effective unless executed

in writing by the party charged therewith. No written waiver shall excuse the performance of any acts other than those specifically referred to herein. The fact that Company has not previously insisted upon Manufacturer expressly complying with any provision or this Agreement shall not be deemed to be a waiver of Company's future right to require compliance in respect thereof and Manufacturer specifically acknowledges and agrees that the prior forbearance in respect of any act, term or condition shall not prevent Company from subsequently requiring full and complete compliance thereafter.

      27.   <u>THIRD PARTY</u>. The parties acknowledge that McDonald's Corporation is a third-party beneficiary of this Agreement, with respect to rights granted to each and each may enforce those rights provided to Company hereunder directly against Manufacturer.

      IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the date first written above.

COMPANY

By: _____

Name: _____

Title: _____

Date: _____

MANUFACTURER

By: _____

Name: _____

Title: _____

Date: _____

### Exhibit B

## McDONALD'S CORPORATION CODE OF CONDUCT FOR SUPPLIERS

McDonald's believes that all employees deserve to be treated with dignity and respect. In each and every aspect of the employment relationship, employers need to act towards their employees as they would themselves want to be treated. The 100% satisfaction of our internal customers – our employees – is essential to the 100% satisfaction of our external customers. Moreover, McDonald's is committed to a policy of complying with the law wherever it does business, and to maintaining high standards of business conduct. As a result, McDonald's has established a well-respected record and reputation for business honesty and integrity. These principles apply globally, form the basis for McDonald's own ethical business practices, and are cornerstones to McDonald's success.

McDonald's strongly believes that those suppliers who are approved to do business with the McDonald's System should follow the same philosophy, and, in the best interest of the System, McDonald's <u>will</u> refuse to approve or do business with those who do not uphold, in action as well as words, the same principles. McDonald's recognizes that its suppliers are independent businesses. Indeed, it honors that very independence because it provides strength to the relationship. Nonetheless, actions by those with whom McDonald's does business are sometimes attributed to McDonald's itself, affecting its reputation and the goodwill it has with its customers and others. It is only natural then that McDonald's expects its partners in business to act with the same level of honesty and integrity.

For these reasons, McDonald's has established the following policy. Compliance with this policy is required of all suppliers, and is the responsibility of each individual supplier. Suppliers shall ensure that their Subcontractors comply with this policy for employees working on product supplied to McDonald's. Failure to comply with this policy will be sufficient cause for McDonald's to exercise its right to revoke a supplier's approved status. McDonald's reserves the right, as a condition of continuation of approval, to conduct (or have its designee conduct) periodic, unannounced inspections of suppliers and their facilities and business practices to verify compliance with these standards.

© 2000 McDonald's Corporation                    - 1 -

## COMPLIANCE WITH APPLICABLE LAWS AND STANDARDS

All business activities of McDonald's suppliers must conform to all applicable national and local legal requirements, customs, and published industry standards pertaining to employment and manufacturing. If statutory requirements and published industry standards conflict, suppliers must, at a minimum, be in compliance with the one which, by law, takes precedence.

## EMPLOYMENT PRACTICES

**Prison or Forced Labor:** The use of prison or forced labor by a supplier is absolutely forbidden. Likewise, the use of labor under any form of indentured servitude is prohibited, as is the use of physical punishment confinement, threats of violence or other forms of physical, sexual, psychological or verbal harassment or abuse as a method of discipline or control. Suppliers will not themselves utilize factories or production facilities that force work to be performed by unpaid or indentured laborers or those who must otherwise work against their will, nor shall they contract for the production of products for McDonald's with Subcontractors that utilize such practices or facilities.

**Child Labor:** The use of child labor by suppliers is strictly prohibited. Suppliers are prohibited from using workers under the legal age of employment for the type of work in the country where the suppliers performs work for McDonald's. If the country in which the supplier is doing business does not define "child" for purposes of minimum age of employment, the minimum age of employment shall be 15 years of age, and the employment of any individual in the production of products for McDonald's below that age shall be strictly prohibited. If local law allows the minimum age of employment to be 14 years of age or younger, the minimum age of employment shall be 14 years of age, and the employment of any individual in the production of products for McDonald's below that age shall be strictly prohibited. In either situation, minors between the ages of 14 and 16 may only be employed to work and only be permitted to work during periods of time when they are not required by law to attend school (except as may be permitted under apprenticeship or other similar programs in which the minor is lawfully participating).

**Working Hours:** Suppliers must ensure that all employees working on products supplied to McDonald's do so in compliance with all applicable national and local laws and with published industry standards pertaining to the number of hours and days worked. Such employees are to be provided with reasonable daily and weekly work schedules and adequate allowance is to be made for time off. Except in extraordinary business circumstances, employees will not be required to work more than either (a) the limits on regular and overtime hours allowed by local law; or (b) 60 hours per week, inclusive of overtime. Adequate time off shall be at least one day off per week, except in extraordinary business circumstances. In the event of conflict between a statute and a published industry standard pertaining to this issue, compliance must be with the one taking precedence under national law.

**Compensation:** Supplier employees working on product supplied to McDonald's must be fairly compensated and provided with wages and benefits that comply with applicable national and local laws. This includes appropriate compensation for overtime work and other premium pay situations required by applicable national and local laws. If local laws do not provide for overtime pay, suppliers will pay at least regular wages for overtime work.

**Non-Discrimination:** Suppliers shall implement a policy that conforms to local and national law prohibiting discrimination in hiring and employment practices on the ground of race, color, religion, sex, age, physical ability, national origin, or any other applicable prohibited basis.

**Workplace Environment:** Suppliers shall provide their employees with safe and healthy working and, where provided, living conditions. At a minimum, potable drinking water, adequate, clean restrooms, adequate ventilation, fire exits and essential safety equipment, an emergency aid kit, access to emergency medical care, and appropriately-lit work stations must be provided. In addition, facilities be constructed and maintained in accordance with the standards set by applicable codes and ordinances.

**Notification to Employees:** Suppliers shall notify employees of the terms of these standards and post the terms, on the supplier's letterhead and in the local language, in a prominent place accessible to all employees.

## INSPECTIONS

**By Suppliers:** Each supplier shall designate one or more of its management staff to be responsible for monitoring their factories and production facilities, and the production facilities of their Subcontractors used in the production of products for McDonald's, for compliance with the standards set forth herein. Each supplier must conduct such monitoring no less frequently than on an annual basis, and must complete, and submit, on an annual basis, a completed verification of compliance, in the form attached, to the McDonald's contact designated on the succeeding "Acknowledgement Page".

**By McDonald's:** McDonald's reserves the right to conduct or have its designee conduct unannounced inspections of suppliers' and their business practices, records, facilities, and, where provided by supplier, housing accommodations, as well as private interviews with employees. Suppliers will keep all information necessary to document compliance with these standards readily accessible. Any supplier who refuses to allow such inspections or interviews, or who does not comply with these standards, is subject to immediate termination of its status as an approved supplier.

## CODE OF CONDUCT ACKNOWLEDGMENT

### ACKNOWLEDGMENT OF TERMS

Accepted and agreed to on behalf of __China Retail Management Limited__, a
supplier to McDonald's.  I acknowledge that I am authorized to bind such company* to
the terms herein.

_Signature_

**Chief Executive Officer**
**(852) 2738 7878**
Title and phone number

**HSIEH Cheng, Jeff**
Print Name

**2 November 2005**
Date

Company and Address (include country):

**UG2/F, Chinachem Golden Plaza, 77 Mody Road, Tsimshatsui, Kowloon,**

**Hong Kong, SAR**

Executive responsible for Social Compliance:

List all product(s) supplied to McDonald's System:

Please return this executed signature page to the following McDonald's representative:

**Dan Chally c/o Social Accountability**
2915 Jorie Blvd, Dept. 061
Oak Brook, IL  60523 U.S.A.

> **\* Please attach a business card of the individual who has signed above.**

> **\* Please attach a list of all supplier/manufacturing locations and their products or services represented by your signature.**

SCHEDULE C

# DIC ENTERTAINMENT ACCOUNTING STATEMENT FORM: ROYALTY ANALYSIS

Mail To:
DIC ENTERTAINMENT
4100 West Alameda Avenue
Burbank, CA 91505
ATTN: Accounting
accounting@dicentertainment.com

Licensee: _____

Contract #: _____

Property: McDonald's    For Calendar Quarter    From: _____    To: _____

| Territory | Distribution Channel | SKU | Description of Licensed Article | Units Per Package | Quantity Shipped | Gross Sales | Allowable Discounts | Allowable Deductions | Allowable Returns | Applicable Taxes | Net Sales | Royalty Rate | Earned Royalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Previous Royalties Earned:    $

Current Period Royalties:    $

Total Royalties to Date:
Advances:    $
Previous Payments:    $
Payment Due    $

Total Marketing Percentage Due:
Less Advance Marketing Payments for Quarter:    $
Balance Remitted *    $

* Payments for Royalty and Marketing Fund shall be made by separate wire transfer and may not be combined

We have examined this report and we certify it to be a true and correct statement as reflected by our books for the above period

_____    Date: _____

_____

Any Licensed Articles deemed CLOSEOUTS must be accounted for separately and designated in the royalty form as CLOSEOUTS. All Earned
Royalties and Marketing Fund Payments shall be due on such Net Sales of Closeouts. However, such Net Sales of Closeouts shall not apply against
the Minimum Net Sales, nor shall payments apply against the Guaranteed Minimum Royalty or Advance Marketing Payment due in any Contract Year.

Page 1 of 2

## SCHEDULE C

## DIC ENTERTAINMENT ACCOUNTING STATEMENT
### FORM
### Retail Analysis and Projections

Licensee: _____

Property: _____    For Calendar Quarter From: _____  To: _____

| Top 10 Retailers | SKU | Description | Total Units | Total Sales |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Please provide to us an **estimate** of what your total net sales and the corresponding royalties will be for your next royalty statement.

| Projected for next Quarter | From: _____ | To: _____ |
|---|---|---|

| Net Sales | |
|---|---|
| Royalties | |

Page 2 of 2

## McDonald's
## Licensing Application

**Important Note:** This application and deal memorandum is solely intended as a non-binding outline of the opportunity with basic and proposed terms for agreement. A binding agreement does not exist between the parties, neither party shall have any obligations to the other, and neither party may rely on any representations or statements to the other party until and unless a long-form license agreement has been executed including all standard terms and conditions. Please note that prior to executing a license agreement any and all work made by "proposed licensee" is at their sole risk and expense.

**I.    PROPOSED LICENSEE INFORMATION**

LICENSEE NAME:
ADDRESS:

TELEPHONE:
FAX:
CONTACT NAME:
CONTACT TITLE:

**II.    DIC CONTACT INFORMATION FOR PROPOSED LICENSEE**

DIC SALESPERSON NAME:
EMAIL:
TELEPHONE:

DIC PRODUCT DEVELOPMENT NAME:
EMAIL:
TELEPHONE:

**III.    PROPOSED BUSINESS TERMS**

PRODUCT CATEGORY:
(e.g., "apparel", "stationery", "toys", etc.)

LICENSED ARTICLES:

LICENSED MARKS:

TERRITORY:
CURRENCY:
EXCLUSIVITY: Non-exclusive

TERM:

     START DATE:

     EXPIRATION DATE:

     CONTRACT YEAR 1:

     CONTRACT YEAR 2:

     CONTRACT YEAR 3:

MARKETING INTRODUCTION DATE:

SELL-OFF PERIOD:

CHANNELS OF DISTRIBUTION:

| | | |
|---|---|---|
| ☐ Amusement | ☐ Drug Stores | ☐ Specialty Chain Stores (e.g., FAO, Carlton, Hallmark, Spencer's, Hot Topic) |
| ☐ Catalogs (with prior written approval by Licensor) | ☐ Duty Free Shops | ☐ Supermarkets & Grocery |
| ☐ Category Chain Stores (e.g., Home, Party, Craft, Office, Book, Electronic, and Sporting Goods Stores) | ☐ Fundraising | ☐ TV Shopping Channels |
| ☐ Close Out Stores | ☐ Independent Stores | ☐ U.S. Military Bases |
| ☐ Convenience Stores | ☐ Mass Merchants (e.g., Wal-Mart, Target, K-Mart, Kaybee) | ☐ Vending Machines |
| ☐ Crane Machines | ☐ Mid-Tier Dept. Stores (e.g., Kohl's, Mervyn's, JCP, Sears) | ☐ Warehouse Stores (e.g., Sam's Club, Costco) |
| ☐ Department Stores (e.g., Bloomingdales, Nordstrom, May, Federated) | ☐ Music and Video Stores (e.g., Blockbuster, Tower, Musicland) | ☐ Web Retailers (with prior written approval by Licensor) |
| ☐ Direct Mail | ☐ Off Price & Discounters (e.g., TJ Maxx, Marshalls, NOT Dollar Stores) | ☐ Other Please Specify: |

## IV.   PROPOSED FINANCIAL TERMS

ADVANCE:    $

GUARANTEE:   $

MINIMUM NET SALES GUARANTEES PER YEAR:

     CONTRACT YEAR 1:   $

     CONTRACT YEAR 2:   $

     CONTRACT YEAR 3:   $

GUARANTEED MINIMUM ROYALTIES PER YEAR:
      CONTRACT YEAR 1:   $
      CONTRACT YEAR 2:   $
      CONTRACT YEAR 3:   $

MARKETING FUND CONTRIBUTION:     % of Net Sales

ADVANCE MARKETING FUND PAYMENTS PER YEAR:
      CONTRACT YEAR 1:   $
      CONTRACT YEAR 2:   $
      CONTRACT YEAR 3:   $

PAYMENT SCHEDULE:

      Advance Payment of $     due upon Licensee's signature of Long Form Agreement
      Payment of $     due on or before
      Payment of $     due on or before
      Payment of $     due on or before

RENEWAL TERM OPTIONS:

ROYALTY RATE:

FOB/OEM:     % points above Royalty

ANNUAL SAFETY TESTING / COMPLIANCE FEE:

PRODUCT LIABILITY INSURANCE REQUIREMENTS:

V. **PROPOSED LICENSEE BACKGROUND INFORMATION**

1. Name other licenses currently held by proposed Licensee and the articles manufactured/distributed for each:

2. Does proposed Licensee currently hold any licenses with McDonald's competitors (i.e., any restaurant service or food/beverage concessionaire)? If yes, please list these licenses and the articles manufactured/distributed for each:

3. How many years has the proposed Licensee been in business?

4. How many years has the proposed Licensee been manufacturing/distributing the licensed articles?

5. What portion of the proposed Licensee's overall business is derived from the sales of the licensed articles?

6. What is the proposed Licensee's annual sales volume?

7. Has the proposed Licensee ever been terminated by a Licensor? If yes, please explain why:

8. Please provide one licensor professional reference:

9. Please provide one retailer professional reference:

VI. **PROPOSED LICENSEE BRIEF OPPORTUNITY OUTLINE**

1. Please describe the business opportunity with respect to the licensed articles within the territories:

2.     Please project the minimum net sales expected per year:

    Contract Year 1:
    Contract Year 2:
    Contract Year 3:

## VII.   SAFETY CONSIDERATIONS

1.     Are the licensed articles subject to any safety (regulatory or industry) or quality standards? If yes, please describe:

2.     Has the proposed Licensee ever subjected the licensed articles to safety testing? If yes, please attach the most recent testing results.

3.     Is there any alleged customer/injury data relating to the proposed Licensee's licensed articles? Has the proposed Licensee had any reported allegations of potentially grievous injuries (e.g., the loss of life, limb, or function of appendages, organs, senses, etc.)?

4.     Does the proposed Licensee have a quality assurance process? If yes, does the proposed Licensee employ quality assurance personnel in the territory of manufacturer and/or within the factories?

5.     Has the proposed Licensee made any "Section 15" reports (CFR) or other formal/informal reports to the United States Consumer Product Safety Commission for any of the licensed articles? If yes, please list and explain. Additionally, has proposed Licensee made any formal/informal reports to any international governmental agency regarding the safety of these products? If yes, please list and explain.

6.     Has proposed Licensee ever had any recalls on any of the licensed articles, either within the United States or in another country? If yes, please describe, including the country and the corrective action taken.

7.   Does proposed Licensee have a Safety Department?  If yes, who is the safety contact, and what is his/her background?  If no, who will be the primary contact in dealing with safety affairs?

8.   Does proposed Licensee utilize any outside safety consulting firms to review products?  If yes, please list the firms.

## VIII.   SOCIAL ACCOUNTABILITY

1.   Does proposed Licensee have documentation of its standards addressing practices in hiring, employment, emergency planning and workplace environment, health and safety?

2.   What internal policies and procedures does proposed Licensee have in place to ensure that it sources from factories that comply with its code of conduct?

3.   Does proposed Licensee have dedicated staff who are accountable to ensure compliance with its code of conduct?

4.   Does proposed Licensee have experience in working within other brands or programs, or within certifications (e.g., ICTI, SA 8000, WRAP, FLA)?

5.   Does proposed Licensee have an engaged third party, external monitoring firm to conduct audits to verify practices?  Please list:

6.   Does proposed Licensee have a clear policy and process for terminating relationships with factories that do not meet its requirements?  If yes, please describe:

# VIII. Acknowledgements and Approvals

The following approvals indicate that the basic terms and information contained within this application are generally acceptable and that DIC Entertainment may proceed to draft a long-form license agreement. A binding agreement does not exist between the parties; neither party shall have any obligations to the other; and neither party may rely on any representations or statements to the other party unless and until a long-form license agreement has been executed including all standard terms and conditions.

## For Proposed Licensee:

_____   Date: _____
Name:
Title:
Company Name:

## For DIC Entertainment:

a) Deal Memo Submitted by:   _____   Date: _____
Name:
DIC Entertainment
Title:

b) DIC Business Approval:   _____   Date: _____
Name:
DIC Entertainment
Title:

c) DIC Legal Approval:   _____   Date: _____
Name:
DIC Entertainment
Title:

## For McDonald's Corporation:

a) McDonald's Business Approval:   _____   Date: _____
Name:
McDonald's Corporation
Title:

b) McDonald's Legal Approval:   _____   Date: _____
Name:
McDonald's Corporation
Title:

c) McDonald's Safety Approval:   _____   Date: _____
Name:
McDonald's Corporation
Title:

This Deal Memo was prepared by:        on this date:

## <u>EXHIBIT E</u>

### McDONALD'S CORPORATION SAFETY APPROVAL PROCESS
### FOR RETAIL CONSUMER PRODUCTS

The following steps do not specify the procedures to be followed by Licensee in obtaining safety approval for a product, but rather facilitate Licensee's understanding of the process.

Every product must comply with **ALL** applicable country/regulatory testing requirements, industry practices and McDonald's safety standards.

**ALL** retail consumer products follow the same process, but may not follow the same path within the process. The safety path will be determined by McDonald's Corporate Safety department. Licensee shall ship no product until receipt of <u>written safety approval from **McDonald's Safety, Security & Social Accountability Department**</u> for that product.

### Step 1 – Concept/Model:

For all retail consumer products (except apparel) Licensee must submit concept drawings and models to a McDonald's approved Safety Consulting Lab. The Safety Consulting Lab will review the concept and provide a recommendation to McDonald's Safety regarding the appropriate process path the product should follow. In addition, the Safety Consulting Lab will provide the appropriate protocols/standards the item must meet in the final product safety verification and testing phase (step 2).

For apparel items, concept drawings and samples will be reviewed by the Licensing Agency. Apparel protocols will be shared with the Licensee by the Licensing Agency. When reviewing the concepts/samples, the Licensing Agency may seek guidance from the Safety Consulting Lab on a particular item. Each style of apparel items <u>must</u> be submitted for final product safety verification and testing (see step 2).

The Safety Consulting Lab does **not** approve any concept designs or models. The Safety Consulting Lab will provide guidance to the Licensee on navigating the safety process and aide in the completion of final safety verification and testing.

### Step 2 - Final Product Safety Verification/Testing

Final safety verification/testing must be performed by a McDonald's approved safety testing laboratory.

The Safety Testing Lab will ensure the product is verified/tested to all required safety standards, for the countries in which the product is to be distributed, as outlined in the protocols/standards provided to the Licensee in Step 1. If the product satisfies the minimum standards for final

CONFIDENTIAL TREATMENT REQUESTED. NOT FOR DUPLICATION.
© 2005 McDonald's Corporation

safety verification and testing, the Safety Testing Lab will provide the testing report to McDonald's Safety, Security & Social Accountability (SSSA) department. McDonald's SSSA will review the documentation. If McDonald's SSSA passes the product, a Final Testing Safety Approval (FTSA) document will be issued to the Licensing Agency who will provide the final approval to the Licensee. Only after the Licensee receives this document (FTSA) can the product be shipped. (**NOTE:** a FTSA/PASS report is only valid for one year. All previously approved products must be resubmitted for Final Product Testing if re-run, reproduced or manufactured more than a year after the last PASS testing report was issued or any alterations are made to the design.)

If the product does not satisfy the minimum standards, the Safety Testing Lab will issue a failure report to the Licensee along with a Corrective Action Plan (CAP) form. The Licensee is required to submit a CAP to the Safety Testing Lab for all failed product. The product must be quarantined until the CAP is approved by McDonald's SSSA. Once the CAP is approved, the safety testing lab will work with the Licensee to conclude the CAP. The Safety Testing Lab may be required to witness re-work and/or destruction of unacceptable product at Licensee's cost.

## Step 3 – Distribution
No product can be shipped/distributed without receiving a Final Testing Safety Approval (FTSA) issued by McDonald's Safety, Security & Social Accountability (SSSA) department. The Licensing Agency is responsible for making sure the FTSA has been executed and will send the approval to the licensee. (**NOTE:** no pass reports will be sent by the Safety Testing Lab to the Licensee – safety approval will only be issued by McDonald's Safety.)

## Step 4 – Post-Sale Verification
Periodically throughout the year, McDonald's may conduct mystery shops of retail outlets throughout the world and purchase McDonald's branded products. These products will be sent to a McDonald's approved safety testing laboratory to verify they comply with McDonald's Retail Safety Process and all applicable country/regulatory testing requirements, industry practices and McDonald's safety standards.

## Step 5 – Customer Incidents
Licensee shall provide McDonald's SSSA with a report of all reported alleged customer incidents on a quarterly basis. In addition, Licensee shall notify McDonald's SSSA of any alleged potentially grievous customer injuries within 24 hours of notice. An example of a potentially grievous injury allegation includes any injury that may result in the loss of life, limb or function (e.g., function of appendages, organs, senses, etc.).

CONFIDENTIAL TREATMENT REQUESTED. NOT FOR DUPLICATION.
© 2005 McDonald's Corporation

## McDONALD'S SAFETY PROCESS

## ACKNOWLEDGEMENT OF TERMS

Accepted and agreed to on behalf of __**China Retail Management Limited**__, a licensee/
supplier of McDonald's Corporation.  I acknowledge that I am authorized to bind such company*
to the terms herein.

_____
Signature

**HSIEH Cheng, Jeff**_____
Print Name

**2 November 2005**_____
Date

**Chief Executive Office**_____
Title

**852 – 2738 7878**_____
Phone Number

Company Address including Country:

**UG2/F, Chinachem Golden Plaza, 77 Mody Road, Tsimshatsui, Kowloon,**_____

**Hong Kong SAR**_____

Executive Responsible for Safety:

_____

List or attach a list of all product(s) to be produced under the McKids brand:

_____

| **\* Please attach a business card of the individual who has signed above.** |
| --- |

Please return this executed signature page to the McDonald's representative whose name
appears below:
Cathy Choffin, Safety, Security & Social Accountability Dept.
McDonald's Corporation
2915 Jorie Blvd., Dept. 108
Oak Brook, IL  60523  U.S.A.

CONFIDENTIAL TREATMENT REQUESTED.  NOT FOR DUPLICATION.
© 2005 McDonald's Corporation

# COMPLAINT
# EXHIBIT B

## FORM OF GUARANTY

This Guaranty (this "**Guaranty**") is entered into as of _____ 2005 by CORNERSTONE OVERSEAS INVESTMENT LIMITED ("**Guarantor**"), in favor of and for the benefit of MCDONALD'S CORPORATION, a Delaware corporation, having an office located at One McDonald's Plaza, Oak Brook, Illinois 60523 (the "**Licensor**"), DIC ENTERTAINMENT CORPORATION, a Delaware corporation, having its principal place of business at 4100 West Alameda Avenue, Burbank, CA 91505 (the "**Agent**" and together with LICENSOR the "**Guarantied Party**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which is hereby acknowledged, and in order to induce the Guarantied Party to enter into that certain license agreement of even date herewith between and among the Guarantied Party and CHINA RETAIL MANAGEMENT LIMITED (the "**License Agreement**"), a related company of Guarantor, Guarantor agrees as follows:

## SECTION 1. THE GUARANTY

**SECTION 1.1  Guaranty**. Guarantor irrevocably and unconditionally guaranties (which guaranty shall constitute a guaranty of payment, not collection) to the Guarantied Party:

(A) the full, complete and prompt performance by CHINA RETAIL MANAGEMENT LIMITED ("**Obligor**") of each and all of Obligor's covenants, agreements, duties, obligations, representations and warranties under the License Agreement, a copy of which is attached hereto as Exhibit "A"; and

(B) the full, complete and prompt performance by Obligor of its covenants, agreements, duties, obligations, representations and warranties that relate to the License Agreement.

**SECTION 1.2  Liability of Guarantor Absolute; Waivers**. Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be subject to any limitation, impairment or discharge for any reason, including any circumstance which constitutes a legal or equitable discharge of a  guarantor or surety other than indefeasible performance in full of the obligations set forth in Section 1.1. Guarantor hereby waives notice of acceptance of this guaranty, presentments, notices of default, nonpayment, partial payments and protest, all other notices or formalities, any right to require prosecution of collection or remedies against any person or entity or to pursue any other remedy in its power.  Guarantor agrees that one or more, and successive and/or concurrent, actions may be brought against it, and that the cessation of the liability for any reason, other than full payment and performance of all obligations, shall not in any way affect the liability of the undersigned hereunder. However, notwithstanding the foregoing, Guarantor has the right to withhold payment to the Guarantied Parties for any amounts that Guarantor believes, in its reasonable judgment, are in dispute until the dispute is resolved between the parties or by a court having jurisdiction over the dispute.

Guarantor hereby waives, for the benefit of the Guaranteed Parties: (i) any defense arising by reason of the incapacity or lack of authority; (ii) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and (iii) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty and any legal or equitable discharge of Guarantor's obligations hereunder.

**SECTION 1.3 Expenses.** Guarantor agrees to pay, or cause to be paid, on demand, and to save the Guarantied Party harmless against liability for, any and all costs and expenses (including fees and disbursements of counsel) incurred or expended by the Guarantied Party in connection with enforcement or preservation of any rights under this Guaranty, to the extent that such costs and expenses are (i) reasonably incurred by the Guarantied Party and (ii) not incurred as a result of actions taken by the Guarantied Parties prior to the 15th day following the Guarantied Party's written demand to Guarantor for payment.

**SECTION 1.4 Continuing Guaranty; Termination of Guaranty.** This Guaranty is a continuing guaranty and shall remain in effect until all of the obligations arising under this Guaranty have been paid in full or otherwise satisfied or discharged.

## SECTION 2. GENERAL PROVISIONS

**SECTION 2.1 Further Assurances.** Each of the parties covenants and agrees to do such acts and things, and, in connection therewith, to execute and deliver such documents and instruments, as reasonably may be required to effect, and otherwise to carry out the purposes of and the transactions covered and contemplated by this Guaranty.

**SECTION 2.2 Assignment.** No party may assign any of its rights or delegate any of its duties hereunder without the prior written consent of each of the other parties.

**SECTION 2.3 Successors and Assigns.** This Guaranty shall be binding upon and inure to the benefit of the parties and their respective legal representatives, successors and assigns.

**SECTION 2.4 Governing Law.** This Guaranty will be governed by and construed and interpreted in accordance with the laws of the state of Illinois without regard to the conflicts of laws provisions. Guarantor submits to the jurisdiction of the United States District Court for the Northern District of Illinois (Eastern Division) and Dupage County State Courts of Illinois in connection with all suits, actions, proceedings or other disputes relating to this agreement, the parties' business relationship, and the licensed products. Guarantor agrees to (1) submit to the personal jurisdiction and venue of the Illinois courts; (2) waive, to the fullest extent permitted by law, any objections to the jurisdiction and venue of the Illinois courts; and (3) waive all rights to trial by jury in any such action. Licensee further agrees that process may be served on it by mailing the same to it by certified mail, return receipt requested, with the same effect as though served upon it personally.

**SECTION 2.5 Counterparts/Facsimile Signature.** This Guaranty may executed in counterparts, each of which shall be an final and all of which shall together constitute one and the same instrument. This Guaranty may be executed by facsimile signature.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed and delivered by its officer hereunto duly authorized on the date first written above.

CORNERSTONE OVERSEAS INVESTMENT LIMITED
GUARANTOR

By: X _____

Its: __Chief Executive Officer_____


DIC ENTERTAINMENT CORPORATION
AGENT/GUARANTIED PARTY

By: _____

Its: SENIOR VICE PRESIDENT
     BUSINESS + LEGAL AFFAIRS.

McDONALD'S CORPORATION
LICENSOR/GUARANTIED PARTY

By: _____

Its: _____